MERTON E. FARR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11725. Promulgated October 7, 1948.

*Fred J. Shumann, Esq.*, and *Robert J. Bird, Esq.*, for the petitioner.
*Cecil H. Haas, Esq.*, for the respondent.

OPINION.

HILL, *Judge*: There are three questions which we must decide concerning the excess proceeds of $114,878.77 received by petitioner from the sale of the Wyandotte property pursuant to the assignment dated October 14, 1938: First, whether they constituted a capital gain under section 117, or ordinary income under section 22 (a); second, if they constituted ordinary income, whether they represented compensation for personal services under section 107; and, third, whether petitioner is entitled to deduct $93,070.95 from such amount of $114,878.77, regardless of the character of such income.

First we shall consider whether the $114,878.77 realized by petitioner from the sale of the Wyandotte property constituted a capital gain under section 117, or ordinary income under section 22 (a). In deciding this question we must bear in mind that section 117 is a statute of partial exemption. Therefore the taxpayer must bring himself squarely within its terms and all fair doubts will be resolved against him. See *Commissioner* v. *Hopkinson*, 126 Fed. (2d) 406, 411, and *Ogle* v. *Helvering*, 77 Fed. (2d) 338, 339.

The assignment of October 14, 1938, specifically stated that petitioner's right to excess proceeds from the sale of the Wyandotte property was in consideration for services rendered by him. So far as the record shows, the owners (at the time of the assignment) of the Wyandotte property were under no financial obligation, legal or moral, to petitioner other than for services by him in relation to the conservation and sale of such property. There is, therefore, no basis in the evidence for a finding that the consideration for the assignment in question was other than the services to such owners in respect of such property as above indicated. Therefore, we hold that the $114,878.77 of the excess proceeds received by petitioner represented compensation for services rendered. By the express language of section 22 (a),[1] compensation for personal services constitutes ordinary income. Thus, such compensation may not be converted into a capital gain under section 117. See Mertens, Law of Federal Income Taxation, sec. 22.11, vol. 3, p. 703, and cases cited therein; cf. *Strauss* v. *Commissioner*, 168 Fed. (2d) 441.

It is true that the Wyandotte realty constituted a capital asset in the hands of its owners, legal and equitable, so that they realized a capital

---

[1] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross Income" includes gains, profits, and income derived from salaries, wages, or compensation for personal services * * * of whatever kind and in whatever form paid * * *.

gain from its sale to E. I. duPont de Nemours & Co. The principal premise for petitioner's contention that he is entitled to treat the $114,878.77 as a capital gain is that he received a beneficial interest in the Wyandotte property by virtue of the assignment of October 14, 1938. Then, by virtue of the doctrine of *Commissioner* v. *Hopkinson*, *supra*, he argues that the proceeds of such sale have the same status in his hands as in the hands of the liquidating trustees, the legal owners of the Wyandotte property. The *Hopkinson* case held that income distributed to the beneficiary of a trust has the same status in the hands of the beneficiary as capital gain or as ordinary income as it would in the hands of the trustee. Thus, under such circumstances the beneficiary might claim income received from the proceeds.of the sale of a capital asset as a capital gain, though he in fact did not make the sale. He would stand in the shoes of the vendors and the sale would be imputed to him. We can assume that the *Hopkinson* case announces a sound principle. However, it is not applicable to petitioner's situation. The assignment in question did not make him the beneficiary of a trust. It is true that the Wyandotte property was the *res* of a so-called liquidating trust, but the assignment to petitioner did not make him a party to it, either as trustor, trustee, or beneficiary. All the assignment did for petitioner was to provide contingently for payment of compensation for his services. The assignment did not convey to petitioner an interest in the Wyandotte property. It merely provided that, if the property should be sold at a price in excess of a certain amount, the excess would be paid to him as compensation for services. It followed, of course, that if there should be no such excess he would receive no compensation for his services.

The recently decided case of *Strauss* v. *Commissioner*, *supra*, presents a fact situation comparable to the facts here. There the owners of a patent assigned a portion of the royalty. payments thereon to the taxpayer as compensation for past services rendered. The court determined that by this assignment the taxpayer received no legal or equitable interest in the patent. The court stated in part:

* * * The taxpayer did not receive for those services any part of the Kodachrome process itself or any right to control the disposition of that process. Rather, he obtained the enforceable promise of the owners of the process that he would be paid for his services a definite portion of the royalties they had the right to receive from the Eastman Kodak Company. That is to say, his "interest in the process" was never greater than a contract right to be paid certain ascertainable sums of money. From first to last his pay for his services was to be only in money determinable in amount by reference to a royalty agreement covering the process. * * *

In none of the cases relied upon by petitioner to show he acquired a beneficial interest in the Wyandotte property did the court pass on

a fact situation in any way comparable to the circumstances of the present case.

We thus conclude that the $114,878.77 received by petitioner from the sale of Wyandotte property may not be classed as a capital gain under section 117, but represents ordinary income under section 22 (a).

Next we must decide whether the ordinary income of $114,878.77 received by petitioner constituted compensation for personal services within the terms of section 107 of the Internal Revenue Code, as amended by section 139 of the Revenue Act of 1942.[2] In determining the validity of this contention by petitioner, we are mindful that section 107 is an exemption statute and petitioner must bring himself within the strict letter of its provisions to gain the benefit of its relief. *Smart* v. *Commissioner*, 152 Fed. (2d) 333, 335; certiorari denied, 327 U. S. 804, and *Lindstrom* v. *Commissioner*, 149 Fed. (2d) 344, 346.

The provisions of section 107 require that at least 75 per cent of the total compensation received for personal services be received or accrued by the taxpayer in one taxable year. Since petitioner filed his tax returns on the cash basis and on the calendar year basis, it is necessary that he should have received at least 75 per cent of the $114,878.77 in one calendar year. We find that petitioner fails to meet this requirement.

The facts show that in 1941 petitioner actually received only $84,878.77 from the sale of the Wyandotte property, which is less than 75 per cent of $114,878.77, the total compensation. The remaining $30,000 was placed in escrow with the National Bank of Detroit in accordance with provision 5 (d) of the contract of sale. This latter sum was actually received by petitioner on July 20, 1942, on submission of documentary evidence of the discharge of the Federal Government's tax lien. Unless it can be said that the $30,000 was constructively received by petitioner during the year 1941, it is clear that less than 75 per cent of the total compensation for petitioner's services was received by him in one taxable year.

---

[2] SEC. 139. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE.

(a) Section 107 is amended to read as follows:

\*     \*     \*     \*     \*     \*     \*

"(a) PERSONAL SERVICE.—If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual."

\*     \*     \*     \*     \*     \*     \*

(b) The amendment made by subsection (a) shall be applicable to taxable years beginning after December 31, 1940, but with respect to a taxable year beginning after December 31, 1940, and not beginning after December 31, 1941, the period specified in such subsection shall be sixty months in lieu of thirty-six months, and the percentage specified in such subsection shall be 75 per centum in lieu of 80 per centum.

When, for the purposes of determining taxable income of a taxpayer on the cash basis, is money said to be constructively received? Regulations 111, section 29.42–2, states the doctrine of constructive receipt in the following manner:

* * * Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. * * *

In determining whether funds held in escrow may be considered taxable income we have found the constructive receipt doctrine inapplicable whenever the escrow agent is an independent third party and it is not within the power of the taxpayer to satisfy the escrow conditions at will. Thus, in the case of *Rebecca J. Murray*, 28 B. T. A. 624, 630, we stated in part:

* * * It must be admitted that they [taxpayers] realized no more income in 1926 than the amount which they reported, unless it can be said that the receipt of the money and note by the escrow agent constituted receipt by the petitioners themselves. We find no justification in the agreement for holding that the trust company acted as agent for either party to the exclusion of the other; rather we believe that the trust company acted in its proper capacity as a disinterested party obligated to see that the terms of the agreement were performed, and upon performance by the parties pay over to either or each of them the property specified in the agreement. Until there was performance by the party of the agreed conditions, there could be no transfer by the escrow agent; upon performance the escrow agent was required to turn over the property specified to the party entitled thereto, and, therefore, as each annual payment was made by the escrow agent to the petitioners, they realized a profit upon the sale made in 1926.

Turning our attention to the escrow agreement in the instant case, we note that it provided in substance that the $30,000 should be paid to Wyandotte Properties, Inc., and thence to petitioner upon the outlawing, release, or discharge of the Federal Government's tax lien on the Wyandotte property; in the event the lien was foreclosed, the escrow agent was to use so much of the $30,000 as necessary to protect the buyer.

The terms of this escrow agreement negate the possibility that petitioner constructively received the escrow fund in 1941. The bank was clearly an independent third party, obligated to see that the conditions of the escrow agreement were carried out before turning over the $30,000. Certainly there was a very substantial restriction as to the time or manner of payment of the escrow fund, for, until the actual outlawing, release, or discharge of the lien it was impossible to determine what, if any, portion of the $30,000 petitioner would receive

or at what date it would be available for him.   Petitioner had no control over these escrow conditions, for fulfillment of them depended upon the course of action taken by the Federal Government.   These conditions were not met prior to 1942, so that at no time during 1941 was the escrow agent authorized to release the fund, and it did not do so.   Thus, it can not be said that during 1941 petitioner either actually acquired the $30,000 or had such control and disposition over it that he constructively received it for income tax purposes.   Since petitioner did not receive at least 75 per cent of the total compensation during one taxable year, section 107 does not apply.

Assuming however this requirement of section 107 is satisfied, we still do not think petitioner has met the further requirement that his personal services cover a period of at least 60 months.   Since the excess proceeds from the sale of the Wyandotte property were assigned to petitioner as compensation for services he rendered the assignors, the secured bondholders of Biddle, we must determine the period over which he performed services for them.   These services began when petitioner and his wife, as trustees, foreclosed the trust mortgage on the Wyandotte property and took title thereto for the secured bondholders on March 23, 1937.   It is true that before that date petitioner performed many acts for Biddle which redounded indirectly to the benefit of the secured bondholders, but they were not personal services rendered for them.   Only when he and his wife took title to the Wyandotte property as trustees for the secured bondholders at their request and he commenced to manage and conserve that realty for their benefit did they receive personal services from him.

In determining the period covered by petitioner's services to the secured bondholders, we are not bound by the terms of the assignment of October 14, 1938, which stated that it was in consideration for "services heretofore rendered."   We are permitted to look behind the express language of the assignment contract to the surrounding circumstances to determine the actual consideration, especially in view of the vague language in which the consideration is couched.   See *Deutser* v. *Marlboro Shirt Co.*, 81 Fed. (2d) 139, 142; *Lincoln National Life Insurance Co.* v. *Horwich*, 115 Fed. (2d) 892; and *Elliott Paint & Varnish Co.*, 44 B. T. A. 241.   There is uncontradicted evidence that at the time the assignment was executed the parties actually had in mind that petitioner would continue to supervise the financial affairs of the Wyandotte property and take responsibility for its preservation in the future as he had in the past.   It is also notable that the liquidating trust agreement continuing the tenure of petitioner and his wife as trustees for the purpose of conserving and liquidating the Wyandotte property was executed on the same date as the assignment.

Since no compensation for such future services was mentioned in the trust agreement and there is no evidence that petitioner ever received any compensation from the secured bondholders except the excess proceeds from the Wyandotte property, it is reasonable to assume that the assignment was also intended to compensate petitioner for such additional services. It would be illogical to compensate petitioner for his services in conserving the Wyandotte property up to the time of the assignment and not compensate him for later services in liquidating the Wyandotte property. Therefore we found as a fact that the assignment of October 14, 1938, was in consideration for both past and future services of petitioner in managing the Wyandotte property for the benefit of the secured bondholders.

Petitioner's services to the secured bondholders terminated with the conveyance of the Wyandotte property to E. I. duPont de Nemours & Co. on July 21, 1941. We previously determined the starting date of petitioner's services was March 23, 1937. Thus, it is apparent the period of petitioner's services fails to total the 60 months required by the statute. We conclude the $114,878.77 received by petitioner was not compensation for personal services within the provisions of section 107.

Finally, petitioner contends that, regardless of the type of income the sum of $114,878.77 represents, he is entitled to deduct therefrom the amount of $85,000 he paid for bonds on which Biddle defaulted and the amount of $8,070.95 of the $12,075.66 representing unreimbursed advances to Biddle for carrying charges on the Wyandotte property, or a total of $93,070.95. He asserts he is entitled to such deductions because he received no tax benefit from such losses and to that extent he received no economic gain and consequently no taxable gain from the sale of the Wyandotte property. He seeks to utilize the losses suffered on earlier transactions to offset the gain realized on the later transaction.

At the start of the hearing petitioner made a motion to amend the petition to incorporate this argument. At that time the motion was denied, but permission was granted to argue the motion in the briefs. Therefore, before we consider the merits of this contention, we must determine two preliminary matters. We must decide first whether this issue is implicit in petitioner's allegations of error, or whether to include it therein it was necessary for petitioner to incorporate it expressly in the petition by amendment; secondly, if such an amendment was necessary, should we grant petitioner's motion for this purpose.

The concept of economic gain invoked by petitioner in his proposed amendment bears no resemblance to the allegations in the amended petition that the sum of $114,878.77 received by petitioner constituted

either proceeds from the sale of a capital asset with cost basis of $85,000 or compensation for personal services within the meaning of section 107. Nor is the factual basis for such a contention contained in the amended petition. The pleadings set forth neither the losses suffered by petitioner due to Biddle's default on its bonds and due to uncompensated advances he made to Biddle, nor the fact petitioner received no tax benefit therefrom. Thus, petitioner's argument presents a new issue entirely foreign to the allegations of error and facts set forth in the amended petition. We conclude that such new issue may be considered by this Court only if it is added to the pleadings by the granting of petitioner's motion. *Dixie Manufacturing Co.*, 1 B. T. A. 641, 646; *W. P. Weaver*, 2 B. T. A. 709, 711; *Coosa Land Co.*, 29 B. T. A. 389, 394.

The question then arises whether petitioner's motion to further amend the petition should be granted. Rule 17 of the Tax Court's Rules of Practice states in part:

> The petitioner may, as of course, amend his petition at any time before answer is filed. After answer is filed, a petition may be amended only by consent of the Commissioner or on leave of the Court.

In the instant case the Commissioner objected at the hearing to such an amendment, so that petitioner's motion may be granted only in the discretion of the Court.

What are the factors considered by the Tax Court in deciding whether to allow a taxpayer to amend his petition once the hearing has commenced and the respondent has objected thereto? In *California Brewing Association*, 43 B. T. A. 721, 725, 726, we set out some of the considerations:

> * * * Although such rulings are matters within the discretion of the Board, this discretion may never be arbitrary and must be controlled by sound reason and fairness. Neither side may take undue advantage of the other, whether purposely or not. The discretion of the Board may not be exercised to permit one party to proceed unless the other has been given a fair opportunity to meet the issue. * * *
>
> There are occasions when amendment of the pleadings may be permitted if, without inconvenience, the trial can proceed without undue delay and without actual unfairness. * * *

In the instant case, while there was no excuse offered at the trial for petitioner's delay in presenting the amendment, we believe it is not prejudicial to respondent to grant the motion. The facts upon which the motion for the amendment is based did not come as a surprise to respondent at the hearing, for they were all contained in the stipulation of facts signed by both parties. For the same reason, no additional evidence or testimony is necessary which would require reopening the hearing and delaying a decision. Since no prejudice to respondent will result, we grant the motion and consider the petition

amended in the manner requested by petitioner. Were it necessary, we should afford respondent a further opportunity to answer the new issue on the merits. However, for the record and for the protection of respondent's rights herein, any new assignments of error and any allegations of unstipulated facts, if any, in such amendment to the petition will be deemed denied by the respondent.

Petitioner's contention is based upon the tax benefit doctrine as expanded by the Supreme Court in *Dobson* v. *Commissioner*, 320 U. S. 489. That decision stated that no principle of law compelled the courts to find taxable income in a transaction where, as a matter of fact, it found no economic gain and no use of the transaction to gain a tax benefit. Regardless of the possible extensions of the tax benefit rule by the *Dobson* case, one certain requirement for invoking it is that there be such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction. This point was made clear in the *Dobson* case, *supra*, on page 502, where the Court said:

\* \* \* Whether an apparently integrated transaction shall be broken up into several separate steps and whether what apparently are several steps shall be synthesized into one whole transaction is frequently a necessary determination in deciding tax consequences. \* \* \* The Tax Court analyzed the basis of the litigation which produced the recovery in this case and the obvious fact that "regarding the series of transactions as a whole, it is apparent that no gain was actually realized." \* \* \*

In all the cases cited by petitioner as authority for applying to the instant case the concept that where there is no economic gain there is no taxable income, the fact situations reveal a close integration of events producing the loss and the gain. In each instance the property on which the loss was suffered can be traced into the transaction producing the gain; the loss and the gain could be attributed to the same *res*.

In the instant case we are unable to find such an interrelationship between the steps which resulted in losses to petitioner and the events which produced the gain in question that we can consider them one and the same transaction. In 1928–1929 petitioner purchased bonds of Biddle in the amount of $85,000, on which no part of the principal was ever paid. During the period from December 15, 1931, to March 23, 1937, petitioner advanced Biddle $12,075.66 for carrying charges on the Wyandotte property, for which he was not reimbursed. The $114,878.77 which petitioner received from the sale of the Wyandotte property was the result of the assignment by the secured bondholders on October 14, 1938. We can find no common denominator in these separate occurrences. Certainly there is no evidence that the purpose of the assignment was to enable petitioner to recoup his losses

previously sustained in transactions with Biddle. We have found the assignment was intended as compensation for services, past and future, rendered by petitioner for the secured bondholders. His payments to Biddle in the form of bond purchases and cash advances were not personal services to these bondholders. Such acts occurred prior to the foreclosure sale on March 23, 1937, when the secured bondholders first acquired an interest in the Wyandotte property and services by petitioner to them commenced. The losses suffered by petitioner as a creditor of Biddle are not related to the assignment which produced the income in question. Where a taxpayer suffers losses and gains on entirely foreign and unrelated transactions, they may not be used to offset each other for income tax purposes. We conclude petitioner is not entitled to deduct the sum of $93,070.95, or any part thereof, from the income he received from proceeds of the sale of the Wyandotte property.

An additional question for our determination is whether the Commissioner was correct in disallowing $346.55 of the $1,346.55 deducted by petitioner for clerical expenses and all of the $448.64 deducted by petitioner for legal expenses for the taxable year ended December 31, 1940, and in also disallowing $1,314.22 of the $2,314.22 deducted by petitioner for clerical expenses for the taxable year ended December 31, 1941. Petitioner contends he is entitled to the entire amount of these deductions because they constitute nonbusiness expenses within the meaning of section 23 (a) (2) of the code, as added by section 121 (a) of the Revenue Act of 1942.[3]

The burden rests upon petitioner to establish that the disallowed deductions are authorized by the statute. *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440; *Hord* v. *Commissioner*, 143 Fed. (2d) 73, 76; *Davis* v. *Commissioner*, 151 Fed. (2d) 441, 442.

The fact that petitioner actually paid the clerks in his Detroit office and his attorneys the full amounts he deducted for clerical and legal expenses for the years 1940 and 1941 was not questioned. But the evidence shows that during these years petitioner's office not only handled his own financial affairs, but also those of his wife, his daughter, the Frederick T. Farr trust, the liquidating trustees

---

[3] SEC. 121. NON-TRADE OR NON-BUSINESS DEDUCTIONS.

(a) DEDUCTIONS FOR EXPENSES.—Section 23 (a) (relating to deductions for expenses) is amended to read as follows:

"(a) EXPENSES.—

\* \* \* \* \* \* \*

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

\* \* \* \* \* \* \*

(d) TAXABLE YEARS TO WHICH AMENDMENTS APPLICABLE.—The amendments made by this section shall be applicable to taxable years beginning after December 31, 1938.

of the Wyandotte property, and Wyandotte Properties, Inc.  The only one other than petitioner who made any payments to the office workers for their services was petitioner's wife, and the amount which she paid is not clearly revealed.  Since petitioner has failed to prove what part of the office help's time was devoted solely to his own affairs and, therefore, what portion of the salaries he paid out can be said to have been expended solely for the management, conservation, or maintenance of his own property, the presumption of correctness attaching to Commissioner's allocation of clerical expenses properly deductible by petitioner must stand.  No explanation of the deduction for legal expenses can be found in the evidence to upset the Commissioner's determination in this regard.  We conclude that such portions of the deductions taken by petitioner for clerical and legal expenses in 1940 and 1941 which were disallowed by Commissioner are not shown to constitute deductible expenses within the terms of section 23 (a) (2).

Since we have decided that, of the $114,878.77 realized by petitioner from the sale of the Wyandotte property, only $84,878.77 was received as income in 1941, it follows that he is taxable in 1941 in respect of the proceeds of such sale only in the latter amount.

*Decision will be entered under Rule 50.*