HAROLD W. JOHNSTON AND CORINNE E. JOHNSTON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19928. Promulgated April 5, 1950.

*Sydney R. Rubin, Esq.,* and *Rupert G. Fain, C. P. A.,* for the petitioners.

*Thomas R. Charshee, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge*: The Commissioner determined a deficiency of $1,820.74 in the petitioners' income tax for 1943. Income of the year 1942 is also involved because of the Current Tax Payment Act of 1943. The only issue for decision is whether the Commissioner erred in determining that the gain which petitioner Harold W. Johnston (hereinafter called the petitioner) realized on the sale of certain stock was taxable in 1943 rather than in 1942. The facts have been stipulated.

Joint income tax returns on the cash basis for the years 1942 and 1943 were filed by the petitioners with the collector of internal revenue for the twenty-eighth district of New York.

The petitioner owned on December 28, 1942, 5,588 out of a total of 224,806 issued and outstanding shares of stock in the Traung Investment Co. (hereinafter called Traung).

A written contract was entered into on December 28, 1942, by Joseph E. Seagram & Sons (hereinafter called Seagram), Carstairs Bros. Distilling Co. (hereinafter called Carstairs), Mount Tivy Winery, Inc. (hereinafter called Mount Tivy), Traung, and the stockholders of Traung, under which Seagram and Carstairs agreed to buy and the stockholders of Traung agreed to sell all of the issued and outstanding shares of stock in Traung.

The terms of the contract of December 28, 1942, were, in part, as. follows:

1. Traung and Mount Tivy hereby warrant and represent that:

(a) Traung is the owner and holder of the entire issued and outstanding common stock of Mount Tivy * * * and that prior to the closing date hereunder all of said preferred stock * * * shall be redeemed.

  *   *   *   *   *   *   *

(e) The balance sheets of Traung and Mount Tivy to be delivered to Seagram and Carstairs at the closing, are to be as of December 28, 1942, and shall be true and complete statements as of the closing date of all of said companies' assets and said companies' liabilities, whether accrued, contingent or otherwise, including without limitation all unpaid tax and other liabilities accrued in respect of, or measured by the income of any period prior to the closing date, or arising out of transactions entered into prior to such date, and including all taxes relating to the properties of said companies.

  *   *   *   *   *   *   *

2. Each of the stockholders of Traung agree [sic] to sell 60% of their [sic] shares of capital stock of Traung to Seagram and 40% of their [sic] capital stock to Carstairs at and for the price computed as hereinafter provided. *It is expressly understood and agreed that Seagram and Carstairs shall not be obligated to purchase any stock of Traung unless the entire issued and outstanding capital stock of Traung is sold to Seagram and Carstairs in accordance with the terms hereof.*

Upon the closing date the stockholders of Traung shall deliver certificates representing their stock in Traung to the purchaser * * * and Seagram and Carstairs shall thereupon pay to the Bank of America * * * for the account of said stockholders, an amount equal to 50% of its estimate of the purchase price. *The balance of the ascertainable purchase price shall be paid to said bank within 10 days after receipt of balance sheets of the Companies and the remaining purchase price shall be paid when and as received in accordance with Exhibit "C".*

3. The purchase price * * * for each share * * * shall be computed by dividing the total number of Traung's shares into the difference between the value of the assets computed in accordance with Exhibit "C" * * * (hereinafter called the "Assets Factor") and of the liabilities (hereinafter called the "Liability Factor") of Mount Tivy as of the closing date, provided, however:

(a) Mount Tivy, or its successors or assigns, shall use ordinary diligence to collect Mount Tivy's accounts receivable, notes receivable, trade acceptance and other collectibles; all such amounts that are not collected by April 1, 1943, shall be referred to Philip S. Ehrlich for the purpose of collection, without expense, cost or liability to, or on the part of Mount Tivy, or its successors or assigns. Any amounts received by Seagram or Carstairs from the collection of said

accounts from Philip S. Ehrlich, or otherwise, shall be paid to the Bank of America, N. T. & S. A. Seagram or Carstairs or Mount Tivy shall have no further responsibility in connection with said accounts receivable.

(b) In the event of loss, damage or destruction to plant or equipment, the Asset Factor shall be reduced to the extent of the decrease in value from the value set forth in Exhibit "C" caused by any such loss, damage or destruction.

(c) With respect to the item described as "Stock in Central Winery, Inc.". Seagram and Carstairs shall permit Philip S. Ehrlich, as representative for the stockholders, at any time upon proper indemnification to Seagram and Carstairs to take any action he sees fit to recover any dividends, capital distribution or negotiate a sale of said stock upon terms and conditions acceptable to Philip S. Ehrlich. Any amounts so received shall be paid to the Bank of America, N. T. & S. A. Seagram and Carstairs shall not be required to take any other action with respect to said stock.

&ast; &ast; &ast; &ast; &ast; &ast;

6. At the closing date Traung shall have no assets other than the outstanding capital stock of Mount Tivy, and shall have no liabilities.

7. The stockholders agree to indemnify and hold Seagram and Carstairs harmless against * * * liabilities of and claims against said companies, contingent or otherwise, existing as of the date of closing or accrued in respect of or arising out of transactions entered into prior to said date and not reflected in or provided for on the balance sheets delivered * * * at the date of closing, or in respect of any contracts, leases, employment agreements or obligations which create any liability on said companies, which liabilities are not set up on said balance sheets * * *.

8. As security for the foregoing indemnity agreement and as security against any loss, cost or expense which may arise to Seagram and/or Carstairs if any representation, warranty or undertaking herein set forth on the part of stockholders, or on the part of Mount Tivy or Traung, is not complied with or made good, the stockholders agree that twenty-five per cent (25%) of the final purchase price to be paid by Seagram and Carstairs may remain on deposit with the Bank of America, N. T. & S. A., subject to the provisions of this paragraph, until December 31, 1943, and from time to time prior thereto, on not less than ten (10) days notice to Philip S. Ehrlich, as representative of said stockholders, said bank, on demand of Seagram or Carstairs, shall apply all or any part of such amount to paying or providing for the payment of any threatened or asserted expense, claim or liability to which the indemnity agreement above relates, or to the making good of any deficiency of the character aforesaid; provided, however, that liabilities not contained in the balance sheets to be delivered to Seagram and Carstairs on the closing date shall not be paid by the bank if within two (2) days after notice to Philip S. Ehrlich by said bank of the filing of a claim said Philip S. Ehrlich objects thereto and simultaneously therewith posts a bond satisfactory to Seagram and Carstairs against any such liabilities, and agrees to defend the same at the cost and expense of the stockholders. On December 31, 1943, such portion of the purchase price then withheld by the bank as to which no notice shall have been given, shall be paid to stockholders in accordance with their respective present stockholdings.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

11. The closing hereunder shall be held on December 30, 1942, at 12:00 o'clock noon, at the Bank of America, N. T. & S. A., California & Montgomery Branch, San Francisco, California.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Exhibit "C" of the contract was a schedule for calculating the value of the assets of Mount Tivy as of December 28, 1942, for the purpose of determining the purchase price of the Traung stock. It fixed unit prices for whatever wine, brandy, and materials and supplies would prove to be on hand; fixed the value of certain assets such as plant and equipment; and provided that the value of certain other assets, namely, "Notes, trade acceptances, accounts receivable, payments due from Central Winery, Inc., G. C. W. and C. W. I. rebates and refunds, processing fees receivable (secured and unsecured)," was dependent upon the "amounts received therefrom."

The stockholders of Traung delivered all of their stock, 224,806 shares, to the purchasers and the purchasers delivered to the Bank of America (hereinafter called bank), for the sellers $214,913.90, on December 28, 1942. That amount was equal to 50 per cent of the total estimated purchase price, and was paid to the bank "for the account of said stockholders." The exact purchase price was not determined or determinable at the time the contract was executed.

A letter dated December 31, 1942, to the bank from M. D. L. Fuller, an attorney representing the purchasers, authorized the bank to hold in escrow the $214,913.90 received by it from Seagram in Fuller's name.

An escrow agreement was entered into on January 27, 1943, by Seagram, Carstairs, Traung, Mount Tivy, and the bank which provided, in part, as follows:

2. The sum of $214,913.90 presently held by Bank under the terms of the above escrow pursuant to a letter dated December 31, 1942, signed by M. D. L. Fuller of the law offices of Pillsbury, Madison & Sutro, represents fifty per cent of the estimated purchase price of the stock of Traung. Bank is authorized to immediately pay the said sum of $214,913.90 to the stockholders and in the proportions mentioned in said Schedule "A".

3. It is the intention of the parties, other than Bank, that Seagram and Carstairs will pay to Bank within ten days after they have received final balance sheet of Mount Tivy and Traung as of close of business on December 28, 1942, balance of said estimated ascertainable purchase price. * * * Additional portions of purchase price payable shall be paid to Bank by Seagram and Carstairs.

4. If Bank receives the balance of said estimated purchase price within the ten day period, as hereinbefore provided, the Bank shall pay the principal and interest on the respective notes of Traung described in Schedule "C" attached hereto upon receipt by Bank of notes for cancellation; said cancelled notes shall be delivered by Bank to Seagram; and after payment of said notes Bank shall set aside and retain, subject to the terms of this escrow, the sum of One Hundred Thousand Dollars ($100,000) as a reserve fund to protect Seagram and Carstairs from any and all expenses, liability of and claims against Mount Tivy and Traung, contingent or otherwise.

Said reserve fund shall be retained and disbursed by Bank subject to the following terms and conditions:

(a) The Bank shall release to Seagram and Carstairs, or either of them, any part or all of said reserve fund upon written demand of either or both of them therefor, or (b) Bank shall apply any or all of said reserve fund in accordance

with or pursuant to written instructions to Bank from Seagram and Carstairs or either of them; provided, however, that before Bank shall comply with the directions of Seagram and/or Carstairs as herein provided written notice of Bank's intention so to comply shall be given to Philip S. Ehrlich as representative of stockholders of Mount Tivy and Traung, ten days prior to Bank's compliance with such instructions of Seagram and Carstairs, providing further, however, that Bank shall not follow the written instructions or demands of Seagram and/or Carstairs if within two days after Bank has mailed its notice of intention to comply with their demands or instructions to Philip S. Ehrlich, he shall serve on Bank his written objections to its carrying out such instructions and demands of Seagram and/or Carstairs and simultaneously therewith he shall post a bond covering the amount of such claim together with an agreement of indemnification and including the assumption of duty to defend against the claim at the cost and expense of stockholders of Mount Tivy and Traung listed on Schedules "A" and "B" attached hereto, which agreement, bond and assumption of liability agreement must bear the written approval of Pillsbury, Madison & Sutro.

5. All moneys received by Bank for the account of this escrow from any sources whatsoever and not required for the reserve fund aforesaid shall be disbursed by the Bank within a reasonable time after receipt thereof, taking into consideration the amount of money to be disbursed, to the stockholders  *  *  *.

6. On December 31, 1943, the Bank shall disburse the remainder of the reserve fund provided for in paragraph 4 above to the stockholders  *  *  *.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Seagram and Carstairs were at all relevant times wholly solvent and financially capable of paying the balance of the purchase price as specified under the terms of said contract.

The 5,588 shares of Traung stock owned by Johnston had a basis for gain or loss in his hands of $5,794.60.   His share of the original $214,913.90 was less than his basis.   Bank, beginning on January 27, 1943, paid or distributed to Johnston $10,625.50 during 1943 constituting his total share of the proceeds from the sale of the Traung stock.

The Commissioner included the gain realized upon the petitioner's sale of Traung stock in his income for 1943.

The parties agree that the petitioner had a gain from the sale of his Traung stock.   The Commissioner has held that it was realized in 1943, whereas the petitioner contends that all, or at least a part, of it was realized in 1942.   The petitioner is on a cash basis and to realize gain must receive during the taxable year cash or its equivalent in excess of his basis before he can have any taxable gain.   Secs. 42 and 111.

His theory is, first, that the cash was actually or constructively received on December 28, 1942, when it was deposited in the bank, since the bank was agent for the sellers.   The evidence as a whole, including the letter of the attorney and the later escrow agreement, shows that the bank was an escrow agent for both sellers and purchasers on December 28, 1942, and for some time thereafter, and was not free to distribute the money, but was to hold it until permitted to dis-

tribute it in 1943. Cf. *Rebecca J. Murray*, 28 B. T. A. 624; *Preston R. Bassett*, 33 B. T. A. 182; affd., 90 Fed. (2d) 1004; *Stoner* v. *Commissioner*, 79 Fed. (2d) 75; *Merton E. Farr*, 11 T. C. 552. But whatever the position of the bank, nevertheless, the cash was not unqualifiedly subject to the demand of the sellers in 1942 and, therefore, was under no circumstances income in 1942 to the petitioner on a cash basis. Cf. *Corliss* v. *Bowers*, 281 U. S. 376; *Hamilton National Bank of Chattanooga, Administrator*, 29 B. T. A. 63. The Commissioner would not hold a taxpayer to constructive receipt of income under such circumstances, Regulations 111, sec. 29.44-2, and the reverse is also true. Furthermore, even if the petitioner were right about his share of the cash, that alone would do him no good, since his share of the $214,-913.90 was less than his basis for gain on his stock and he, on a cash basis, realized no gain until the "amount realized" by receipt exceeds that basis. *Burnet* v. *Logan*, 283 U. S. 404; sec. 42. See also Regulations 111, sec. 29.44-4. A special provision, section 44 (b), was required to permit cash taxpayers to report the proportionate part of the ultimate gain represented by each installment of the purchase price. This taxpayer does not come within that special elective rule and must follow the general rule as indicated above.

The petitioner is thus required to make the further argument that the contract of December 28, 1942, was "property (other than money)" and, therefore, a part of the "amount realized," within the meaning of section 111 (b), and that this contract had a fair market value in the hands of the sellers equal to the then estimated balance of the purchase price. However, this theory is contrary to his method of reporting income, the cash receipts method. The present situation demonstrates the difference between the cash receipts method and the accrual method. An agreement, oral or written, of some kind is essential to a sale. If payment is made at the same time that the obligation to pay arises under the agreement, then the profit would be reported at that time no matter which method was being used. However, the situation is different when the contract merely requires future payments and no notes, mortgages, or other evidence of indebtedness such as commonly change hands in commerce, which could be recognized as the equivalent of cash to some extent, are given and accepted as a part of the purchase price. That kind of a simple contract creates accounts payable by the purchasers and accounts receivable by the sellers which those two taxpayers would accrue if they were using an accrual method of accounting in reporting their income. But such an agreement to pay the balance of the purchase price in the future has no tax significance to either purchaser or seller if he is using a cash system. The petitioner may not thus adopt, for this limited purpose, a feature of an accrual method, but, having always used a cash receipts method of

reporting his income, he must adhere consistently to the general rule of that method, which is that no gain is realized until the "amount realized" by receipt exceeds the basis for the property being sold. It would be quite inconsistent under that method to value a contract like the present one and include that value in the "amount realized" under section 111 (b). Cf. *Bedell* v. *Commissioner*, 30 Fed. (2d) 622, affirming 9 B. T. A. 270; *Charles C. Ruprecht*, 16 B. T. A. 919; *Dudley T. Humphrey*, 32 B. T. A. 280; *Alice G. K. Kleberg*, 43 B. T. A. 277.

Incidentally, the amount of the purchase price was not known or ascertainable in 1942, so that even an accrual basis taxpayer might have been unable to accrue and report the profit for that year. Finally, the record does not establish a fair market value for this contract. *Bedell* v. *Commissioner, supra; Helvering* v. *Walbridge*, 70 Fed. (2d) 683; *Perry* v. *Commissioner*, 152 Fed. (2d) 183. The petitioner did not receive any cash or its equivalent in 1942, and the Commissioner did not err in taxing the admitted gain to the petitioner in 1943, in which year he received the full purchase price for his stock in cash.

Cases involving taxpayers upon an accrual basis are distinguishable, because what is said herein applies only to taxpayers upon a cash basis. Likewise, cases in which it does not appear which basis of accounting was being used are not authority here. Cases in which there was not merely a simple contract, but some property such as a note, bond, mortgage, or other security which might readily pass from hand to hand and which might have some fair market value, are also distinguishable. The cases of *Harry C. Moir*, 14 B. T. A. 23; affd., 45 Fed. (2d) 356, and *Old Colony Trust Co., Executor*, 12 B. T. A. 1334, are not readily distinguishable unless what was done in those cases was the equivalent of the giving of a mortgage or a note adequately secured. However, if those cases are not distinguishable, then we now think they were incorrectly decided and contrary to cases cited above. They will not be followed.

Reviewed by the Court.

*Decision will be entered for the respondent.*