ROSE CHAMPY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF SYLVIA CHAMPY, DECEASED, BARBARA DAUCOT, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Champy v. Commissioner
Docket Nos. 7883-92, 7884-92
United States Tax Court
T.C. Memo 1994-355; 1994 Tax Ct. Memo LEXIS 364; 68 T.C.M. (CCH) 242; July 27, 1994, Filed *364 Decision will be entered under Rule 155. For petitioners: Nicholas S. Guerrera. For respondent: Robert M. Finkel. DINAN
DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined a deficiency in petitioner Rose Champy's Federal income tax for the year 1986 in the amount of $ 1,335 and a deficiency in petitioner Sylvia Champy's Federal income tax for the year 1986 in the amount of $ 1,336. Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. The issues for decision are: (1) Whether petitioners are entitled to use the installment method in reporting the gain realized by them from the liquidation of their *365 corporation pursuant to section 337(a); and (2) whether petitioners overstated the long-term gain resulting from the liquidation of their corporation. [2]
At the time petitioner Rose Champy filed her petition, she resided in Methuen, Massachusetts. At the time Barbara Daucot, Executrix of the Estate of Sylvia Champy, filed the petition for the Estate of Sylvia Champy, she resided in Methuen, Massachusetts. Sylvia Champy died on February 11, 1991. During 1986, Rose Champy and Sylvia Champy were the two remaining shareholders of Champy Construction, Inc. (Champy Construction), a family company begun in 1905 by Anthony Champy, Rose and Sylvia Champy's father, and incorporated in the Commonwealth of Massachusetts sometime later. Each owned 50 percent of all the issued and outstanding stock in Champy Construction. *366 Over the years, Rose and Sylvia Champy had inherited all the stock of Champy Construction from other shareholders of the corporation, who were also members of the family. Rose Champy was the president-treasurer, and a director, and Sylvia Champy was the clerk and a director of the corporation. There were no other officers or directors. The corporation ceased operating in 1973. Since then, the corporation has been primarily holding and slowly selling those assets acquired when the corporation was an active business, as was needed to benefit the remaining shareholders. In mid-1986, Rose and Sylvia Champy hired Andover Realty, a local real estate company, to sell the most valuable remaining asset of Champy Construction, a 76.53 acre parcel of land located partly in Andover, Massachusetts, and partly in Lawrence, Massachusetts (Andover-Lawrence parcel). Rose and Sylvia Champy originally asked $ 4,000,000 for the Andover-Lawrence parcel. After some searching, Arbor Realty located a potential buyer by the name of Stephen J. DeCrosta, who offered to purchase the Andover-Lawrence parcel for $ 3,200,000. Rose and Sylvia Champy accepted Mr. DeCrosta's offer. On November 17, 1986, *367 Rose Champy and Sylvia Champy, acting in their capacities as officers of Champy Construction, executed a purchase and sale agreement on behalf of Champy Construction with Mr. DeCrosta. The agreement provided for the sale by Champy Construction of the Andover-Lawrence parcel to Mr. DeCrosta for a total price of $ 3,200,000. The agreement stated that, at the signing of the agreement, Mr. DeCrosta had deposited $ 50,000 with Andover Realty, and that the balance due, $ 3,150,000, was payable in cash or cash equivalents upon delivery of the deed. The agreement further provided that Andover Realty's broker fee of $ 320,000 was to be split equally between the buyer and the seller. [3]
After the agreement had been signed, Rose Champy contacted Howard Camuso, a long-time family *368 friend and retired State district court judge, for advice regarding the sale. Mr. Camuso agreed to represent Rose and Sylvia Champy. However, because Mr. Camuso had retired from the legal profession and was spending half the year in Florida, with Rose and Sylvia Champy's approval, he retained a local real-estate attorney by the name of Mark McCominskey to handle much of the day-to-day work and a certified public accountant by the name of Bernard Kavanagh to handle the tax aspects of the agreement. Mr. Kavanagh advised that, if the transaction was properly structured and, more importantly, completed prior to the end of the year 1986, Rose and Sylvia Champy's tax liabilities would be significantly less than they first thought. The parties originally planned to sell the land through the corporate form and then to distribute the proceeds to Rose and Sylvia Champy. Mr. Kavanagh advised that as originally planned, two taxable events would occur; the first when the corporation sold the land, and the second when the corporation distributed the proceeds to the shareholders. Mr. Kavanagh suggested that Rose and Sylvia Champy on behalf of the corporation, prior to 1987, adopt a section *369 337(a) plan of liquidation, complete the sale of the Andover-Lawrence parcel, and liquidate the corporation. By adopting a section 337(a) plan of liquidation in 1986, the tax at the corporate level would be eliminated. [4] By completing the sale and liquidating the corporation during 1986, the gain would be taxed at the 1986 long-term capital gain rates. [5] The Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, repealed section 337(a) and increased the effective, long-term capital gain rates, beginning after December 31, 1986. *370 On December 10, 1986, Champy Construction adopted a plan of liquidation designed to comply with the requirements of section 337(a). The plan of liquidation provided that following the sale of the Andover-Lawrence parcel on December 30, 1986, there was to be an immediate, final liquidating distribution of corporate assets and liabilities to the shareholders, Rose and Sylvia Champy. Champy Construction listed the following assets and liabilities in its December 10, 1986, plan of liquidation: Assets
Fair Market Value
Cash
$ 11,417.22
GMC Van
10,000.00
Land
3,500,000.00
Liabilities
Accrued Expenses
$ 5,000.00
The land consisted of the Andover-Lawrence parcel and rental property, a building. The Andover-Lawrence parcel was valued at $ 3,200,000, the amount of the purchase price offer from Mr. DeCrosta, and the rental property was valued at $ 300,000. [6] During 1986, Champy Construction was receiving approximately $ 1,000 per month for use of the building. *371 On December 15, 1986, Rose Champy and Sylvia Champy, acting in their capacities as officers of Champy Construction, executed a second purchase and sale agreement on behalf of Champy Construction with Mr. DeCrosta. The second agreement was identical to the November 17, 1986, agreement in all respects, except that the December 15, 1986, agreement provided that the deposit was to be held by the sellers, and the following provision was added: Seller, Champy Const. Co., Inc., and its Corporate officers as representatives of said Corporation and individually hereby aver that land referred to herein has been used primarily as agricultural land and that they, both in their corporate and individual capacities, will indemnify and hold harmless the Buyer or his assigns from any and all cost and expenses relating to the removal, disposal and isolation of any hazardous materials or substances therefrom as defined by applicable State and Federal statutes.
The deposit received from Mr. DeCrosta was held by Mr. McCominskey. Sometime after the signing of the second agreement, the parties agreed that, instead of accepting cash, Champy Construction would accept a personal, promissory note *372 from Mr. DeCrosta in the amount of $ 2,950,000, in exchange for the Andover-Lawrence parcel. Prior to or at closing, Mr DeCrosta made an additional deposit on the Andover-Lawrence parcel with Mr. McCominskey in the amount of $ 200,000. Neither Mr. Camuso or Mr. McCominskey investigated the financial condition of Mr. DeCrosta. Apparently, Rose and Sylvia Champy had convinced Mr. Camuso that Mr. DeCrosta, who appeared to be very wealthy, was very capable of paying the promissory note. Closing occurred on December 30, 1986, as planned. Mr. DeCrosta delivered to Mr. McCominskey a promissory note in the amount of $ 2,950,000 payable to Champy Construction, and a mortgage secured by the Andover-Lawrence parcel in the amount of $ 2,950,000 to Champy Construction. The promissory note stated, in pertinent parts, as follows: FOR VALUE RECEIVED, I, STEPHEN J. DE CROSTA, promise to pay to CHAMPY CONSTRUCTION, INC., a Massachusetts Corporation having its principal office at 11 Champy Lane, Methuen, Essex County, Massachusetts, or order, the sum of TWO MILLION NINE HUNDRED FIFTY THOUSAND AND No/100 ($ 2,950,000.00) Dollars, ON DEMAND from this date, with interest to be paid monthly *373 at the rate of one percentage point above the prime rate of The First National Bank of Boston, but in any event, no less than ten percent (10%) per annum during said term, and for such further time as the said principal sum or any part thereof shall remain unpaid. Both principal and interest to be payable in legal tender money of the United States of America. Payment shall be first applied to interest then due and the balance thereof remaining applied to principal. [Emphasis added]
The promissory note received from Mr. DeCrosta was actually drafted by Mr. McCominskey. Mr. McCominskey drafted the promissory note with the intention that the promissory note be payable on demand. Mr. McCominskey delivered to Mr. DeCrosta a quitclaim deed executed by Rose Champy, as president of Champy Corporation, conveying a fee simple interest in the Andover-Lawrence parcel and a letter (December letter). The December letter was signed by Rose Champy, as president of Champy Construction and individually, and Sylvia Champy, as clerk of Champy Construction and individually. The December letter stated, in pertinent part, as follows: The Corporation acknowledges that the Note is payable *374 ON DEMAND, but the Corporation, duly authorized by Vote of the Stockholders and Board of Directors, will not charge any interest on said Note for a period of one hundred twenty (120) days. [Emphasis added.]
Rose and Sylvia Champy were not present at the closing. The plan of liquidation was implemented immediately following the completion of the sale of the Andover-Lawrence parcel. Champy Corporation assigned the assets and liabilities of Champy Corporation to Rose and Sylvia Champy. Mr. Kavanagh estimated the fair market value of the assets and liabilities distributed from Champy Construction to be as follows: Assets
Cash
$   240,038
Rental Property
300,000
Van
10,000
Promissory Note
2,950,000
$ 3,500,038
Liabilities
Commissions
$ 160,000
Legal Fees
100,000
Accounting
120,000
$ 380,000
Problems with the sale began to develop rather quickly. For reasons not made clear to us, payment on the promissory note from Mr. DeCrosta was not forthcoming, as had been expected by Rose and Sylvia Champy. As a concession for his failure to pay and in order to prevent foreclosure, Mr. DeCrosta agreed that he would pay "all interest, penalties, and/or other charges" *375 related to the nonpayment of Rose and Sylvia Champy's 1986 Federal income tax liabilities. Mr. Kavanagh was responsible for preparing Rose and Sylvia Champy's State and Federal income tax returns. On Schedule D of Rose and Sylvia Champy's respective Forms 1040, Mr. Kavanagh reported that the liquidation of Champy Construction produced long-term capital gain in the amount of $ 1,559,201 from the redemption of stock. Mr Kavanagh determined the gain from the redemption of stock as follows: Rose
Sylvia
Total
Amount Received
$ 1,750,019 $ 1,750,019 [1] $ 3,500,038 Basis
(190,818)
(190,818)
[2] (381,636)
Gain
$ 1,559,201 1,559,201 $ 3,118,402
Part IV of each Schedule D was titled "Complete This Part Only If You Elect Out of the Installment Method and Report a Note or Other Obligation at Less Than Face Value." Underneath the title, there was a box to be checked if the taxpayer was electing out of the installment method. Below the box, there was a space where the taxpayer was to enter the value of such note. Mr. Kavanagh did not complete this section. *376 Mr. Kavanagh did not believe this section was applicable because, among other reasons, he regarded the promissory note as a demand note. In any event, Mr. Kavanagh did not intend for Rose and Sylvia Champy to elect out of the installment method. On April 6, 1987, Mr. Kavanagh signed each return and submitted them to Mr. McCominskey for his review and signing by Rose and Sylvia Champy. Rose and Sylvia Champy each signed their returns on April 6, 1987. Rose Champy never reviewed her return prior to signing. For the year 1986, Rose Champy reported her 1986 Federal income tax liability as $ 306,402, and Sylvia Champy reported her Federal income tax liability as $ 306,201. [7]
The liquidation created a sizeable Commonwealth of Massachusetts income tax liability, which, combined with the Federal income tax liability, greatly exceeded the deposit received from Mr. DeCrosta. *377 Rose and Sylvia Champy had no other funds available from which to pay their tax liability. Mr. Kavanagh, Mr. Camuso, and Mr. McCominskey concluded that the best course of action was for Mr. McCominskey, who had Mr. DeCrosta's deposit, to use the deposit to pay the full amount of the State income tax due and then to pay the remaining balance to the IRS. After paying State taxes, Mr. McCominskey was able to forward a payment of $ 23,671 with each Federal return. Sometime after Rose and Sylvia had signed their respective returns, Mr. McCominskey drafted a statement (tax statement), that he attached to each return. The tax statement read as follows: Taxpayer is in possession of Promissory Note from a third party under which substantial payments were to be made by said third party on or before April 15, 1987, but said third party has not made any payments on said Note. Taxpayer elected out of installment sale and will make payment of tax due, plus any additions to said tax, as soon as funds are available.
Neither Rose nor Sylvia Champy was informed of the addition of the tax statement or of the tax statement's contents. Rose and Sylvia Champy never received any money *378 from Mr. DeCrosta, other than the $ 250,000 deposit. As a result of the sale and liquidation, Rose and Sylvia Champy each owed a Federal income tax liability of nearly $ 300,000 and had insufficient funds from which to pay such tax liability. To make matters worse, Mr. DeCrosta filed for protection under the Bankruptcy Code in November 1987 to prevent foreclosure by Rose and Sylvia Champy. Later, in 1989, petitioners terminated the employment of Mr. Camuso, Mr. McCominskey, and Mr. Kavanagh. Sometime thereafter, petitioners retained another attorney who filed a lawsuit against Mr. Kavanagh, Mr. Camuso, and Mr. McCominskey alleging, among other things, malpractice. The first issue for decision is whether petitioners are entitled to use the installment method in reporting the gain realized by them in connection with the liquidation of their corporation. Respondent contends that the promissory note was a demand note, which is not eligible for the installment method of reporting, or, if the promissory note was not a demand note, that petitioners elected out of the installment method by reporting the full amount of the gain on their respective returns and/or attaching the tax statement *379 to their respective returns. Petitioners assert that the promissory note was payable at a definite time and that they did not elect out of the installment method because they did not substantially comply with the regulations prescribing how to effect such an election out of the installment method. [8]
Section 453 generally provides that income from an installment sale is accounted for under the installment method. Bolton v. Commissioner, 92 T.C. 303, 305 (1989). An installment sale is defined as a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b)(1). Section 453(f)(3) provides that the term payment does not include the receipt of evidence of indebtedness *380 of the person acquiring such property (whether or not payment of such indebtedness is guaranteed by another person), except as provided in paragraph (4). Section 453(f)(4) provides that the receipt of evidence of indebtedness that is payable on demand shall be considered the receipt of payment. Therefore, an obligation received by a taxpayer that is payable on demand shall be considered payment in the year the obligation is received, and shall not be considered an installment obligation payable in future years. Sec. 15A.453-1(e)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10718 (Feb. 4, 1981). An obligation shall be treated as payable on demand only if such obligation is treated as payable on demand under applicable State or local law. Sec. 15A.453-1(e)(3), Temporary Income Tax Regs., 46 Fed. Reg. 10719 (Feb. 4, 1981). The Commonwealth of Massachusetts has adopted the Uniform Commercial Code (UCC). Mass. Gen. L. ch. 106, secs. 1-101 to 9-507 (1988). The UCC applies to negotiable instruments. A negotiable instrument is a writing that complies with the requirements of Mass. Gen. L. ch. 106, sec. 3-104(1) (1988). [9]
*381 Negotiable instruments that are payable at sight, on presentation, and, in which no time for payment is stated, are payable on demand. Mass. Gen. L. ch. 106, sec. 3-108 (1988); Shawmut Bank, N.A. v. Miller, 415 Mass. 482, 484, 614 N.E.2d 668, 669 (1993). An instrument is payable at a definite time, where the terms of the instrument specify that the instrument is payable: (1) On or before a stated date or at a fixed period after a stated date; (2) at a fixed period after sight; (3) at a definite time subject to acceleration; (4) at a definite time subject to extension at the option of the holder, or to extension to a further definite time at the option of the maker or acceptor or automatically upon or after a specified act or event. Mass. Gen. L. ch. 106, sec. 3-109(1) (1988). The terms of the instrument may be modified or affected by any other written agreement executed as part of the same transaction, between the immediate parties. Mass. Gen. L. ch. 106, sec. 3-119 (1988). A writing that is executed as part of the same transaction is to be read together with the negotiable instrument as a single agreement. Between the immediate *382 parties, a negotiable instrument is merely a contract and is not an exception to the principle that the court will look to the entire contract in writing. Mass. Gen. L. ch. 106, Comment 3, sec. 3-119 (1988). The parties agree that the promissory note is a negotiable instrument governed by the UCC, as adopted and interpreted by the Commonwealth of Massachusetts. The parties disagree as to whether the promissory note should be characterized as payable on demand. Thus, the first issue we must decide is whether the promissory note is payable on demand because, if the promissory note is payable on demand, petitioners are not entitled to use the installment method of reporting. Petitioners implicitly concede that the promissory note, as drafted, is payable on demand. However, petitioners argue that the promissory note must be viewed in conjunction with the December letter. Petitioners assert that the "entire contract" was conditioned on Mr. DeCrosta's obtaining financing and clear title to the Andover-Lawrence parcel. According to petitioners, when the promissory note and December letter are properly read together, the documents demonstrate an intent on behalf of the parties to *383 transform the promissory note from a promissory note payable on demand to a promissory note payable at a definite time; i.e., only after the buyer obtained financing and clear title. Mass. Gen. L. ch. 106, sec. 109(1)(d) (1988). We disagree. The language employed in the promissory note makes it clear that the parties intended that the promissory note was to be payable on demand. The instrument clearly and unambiguously states that it is payable "ON DEMAND". Petitioners' attorney, Mr. McCominskey, stated that he intended, as drafter of the promissory note, for the promissory note to be payable on demand. Furthermore, there is simply nothing in the language of the December letter that makes the promissory note contingent on the buyer's obtaining financing or clear title. The December letter is a carefully drafted statement that was designed to waive the payment of interest for 120 days, yet to also preserve the payable on demand character of the promissory note. We note that, if there was such a contingency that depended on Mr. DeCrosta obtaining financing, based on the record, the contingency appears to have been unenforceable. Not only did Mr. DeCrosta not obtain financing, *384 but he filed for bankruptcy to prevent Rose and Sylvia Champy from foreclosing on the Andover-Lawrence parcel. The liquidation of Champy Construction was designed by Mr. Kavanagh to minimize the tax liability resulting from the sale of the Andover-Lawrence parcel to Mr. DeCrosta. A central and crucial aspect of such plan was that the sale of the Andover-Lawrence parcel be completed prior to the end of 1986. For reasons not made clear to us, in order to complete the sale, Mr. Camuso and Mr. McCominskey chose to accept a promissory note payable on demand from Mr. DeCrosta and choose to accept such promissory note without having investigated the credit-worthiness of Mr. DeCrosta. Petitioners' belated attempts to contradict the testimony of their advisers, who planned and carried out the sale, are simply unconvincing. The second issue for decision is whether petitioners overstated their long-term gain relating to the liquidation of Champy Construction. [10]
*385 Section 331(a) provides that an amount received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as full payment in exchange for the stock. Section 1001(a) provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis. The amount realized is the sum of any money received plus the fair market value of any other property (other than money) received. Sec. 1001(b); sec. 1.331-1, Income Tax Regs.
Section 1011(a) provides that the adjusted basis for determining the gain or loss from the sale or other disposition of property shall be the basis of such property, adjusted as provided in section 1016. Sec. 1.1011(a), Income Tax Regs. Generally, the basis shall be the cost of such property. Sec. 1012; sec. 1.1012-1, Income Tax Regs.
Rose and Sylvia Champy reported that they received the following amounts from the liquidation of Champy Construction: Cash
$   240,038
Rental Property
300,000
Van
10,000
Promissory Note
2,950,000
Petitioners contend that they incorrectly determined the amount received in the liquidation of Champy Construction. Specifically, *386 petitioners contend that they did not actually or constructively receive the cash in 1986 that was deposited with Mr. McCominskey and that the rental property was overvalued. We address petitioners' argument with respect to the receipt of cash first. Petitioners argue that there was an "understanding" between the parties that the entire $ 250,000 deposit from Mr. DeCrosta was to be held by Mr. McCominskey, subject to the buyer, Mr. DeCrosta, obtaining financing and clear title. Moreover, they contend that $ 200,000 of the $ 250,000 deposit had an added restriction in that such money was held by buyer's counsel as co-agent with Mr. McCominskey subject to the same restrictions. [11] According to petitioners, if Mr. DeCrosta was unable to obtain clear title to the Andover-Lawrence parcel or if financing was not found, he was entitled to deed the property back to them. *387 Money deposited in an escrow account by a buyer is not deemed to be constructively received by a cash basis seller of an asset where such money is subject to substantial limitations or restrictions. Stiles v. Commissioner,69 T.C. 558, 563 (1978); Johnston v. Commissioner,14 T.C. 560, 565 (1950); sec. 1.451-2, Income Tax Regs.
We find some support for petitioners' argument in the testimony of Mr. McCominskey, but, based upon the entire record, not enough to carry petitioners' burden. At times, Mr. McCominskey does seem to imply that he did not have complete, unfettered control of Mr. DeCrosta's deposit. However, to what extent Mr. McCominskey's control over the funds was limited, or, if his control was, in fact, limited, has not been fully explained by petitioners. Rose Champy had very little understanding of the details of the transaction.[12] Petitioners chose not to subpoena either Mr. DeCrosta or his counsel to testify in this matter. We presume they could have shed critical light on this issue. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). *388 Where the taxpayers have not presented the testimony of a critical witness, we will not presume that such testimony would have been favorable to the taxpayer. Indeed, the normal inference is that the testimony would have been unfavorable. Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). Moreover, petitioners were unable to support their argument with documentary evidence demonstrating that such funds deposited with Mr. McCominskey were subject to any substantial limitations or restriction. [13]
*389 Petitioners bear the burden of establishing that they did not actually or constructively have receipt of the funds deposited with Mr. McCominskey. Rule 142(a). In this case, they have simply not done that. Accordingly, we reject petitioners' argument, and we find that petitioners received $ 240,038 during 1986 from the liquidation of Champy Construction, as originally reported on their respective returns. On brief, petitioners' contend that the fair market value of the rental property was only $ 54,000, and not $ 300,000, as reported and accepted by respondent in her notice of deficiency. At trial, petitioners presented no evidence that the fair market value of the rental property was less than that reported on their returns. Accordingly, we find that the fair market value of the rental property was as reported, $ 300,000. We have considered the remainder of the parties' arguments, and we find them to be without merit. In summary, we find that petitioners did not overstate the amount of long-term capital gain realized as a result of the liquidation of Champy Corporation. Based on the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners contend in an amended return that they were entitled to carry back to 1986 net operating losses from 1987. This argument was not made at trial or on brief. Therefore, we consider the issue conceded.↩
3. There was another provision in the agreement that required Mr. DeCrosta to confirm financing of 50 percent of the purchase price within 15 days from the date of the signing of the agreement. Apparently, this provision was either waived or ignored.↩
4. Section 337(a), as in effect prior to the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, provided that, if pursuant to a plan of liquidation, within a 12-month period all the assets of a corporation are distributed, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange of property within such 12-month period. Sec. 1.337-1, Income Tax Regs.↩
5. As a result of the loss of the section 1202 capital gains deduction under the Tax Reform Act of 1986, Pub. L. 99-514, sec. 301, 100 Stat. 2085, 2216, the effective, long-term capital gain rate was increasing from 20 percent to 28 percent. By completing the sale in 1986, as opposed to 1987, Rose and Sylvia Champy expected to reduce the total Federal tax liability resulting from the sale and liquidation by approximately $ 249,472 ($ 3,118,402 x 8 percent).↩
6. The record is not clear as to why the rental property was valued at $ 300,000. Petitioners contend on brief that the $ 300,000 value was based on a preliminary purchase offer that never materialized.↩
1. See supra p.9.↩
2. See supra p.9, the liabilities assumed plus the total stock basis of $ 1,636.↩
7. When Rose and Sylvia Champy signed their respective returns, the amount of payment that was to be included with each return had not been determined.↩
8. At trial, petitioners argued that they were precluded under section 453(h)↩ from electing out of the installment sale method. Since petitioners did not continue to make this argument on brief, we conclude they have abandoned it.
9. In order for a writing to be a negotiable instrument, such writing must be: (a) Signed by the maker or drawer; (b) contain an unconditional promise to pay a sum certain in money and no other promise, order, obligation or power; (c) be payable on demand or at a definite time; and (d) be payable to order or bearer. Mass. Gen. L. ch. 106, sec. 3-104(1) (1988); Universal C.I.T. Credit Corp. v. Ingel, 347 Mass. 119, 196 N.E.2d 847, 851↩ (1964); see 1 White & Summers, Uniform Commercial Code, sec. 14-4 (3rd ed. 1988).
10. Respondent determined that petitioners' understated their gain from the liquidation of Champy Construction. Respondent did not provide an explanation as to how such a determination was made. There is no explanation in the record or in respondent's brief as to how she determined the amount received by petitioners from the liquidation of Champy Construction or how she determined the amount of petitioners' basis. We will, therefore, base our decision on the record in this case.↩
11. Petitioners argument on brief conflicts with their argument at trial. At trial, petitioners stated that they received the original $ 50,000 deposit, and that only the later $ 200,000 deposit was held in escrow subject to such restrictions.↩
12. Rose Champy did not fully understand the reason for the liquidation of Champy Construction, other than Mr. Kavanagh advised that to do so would reduce her tax liability.↩
13. As we noted before, if there was such a contingency dependent on the buyer's obtaining financing, etc., apparently the contingency was not enforceable. We also surmise that, if such a contingency existed in the minds of any of the parties, the reason the contingency was not contained in any of the documents was so that the sale of the Andover-Lawrence property would appear to be completed in 1986.↩