BANKLINE OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60671. Filed May 29, 1958.

*Melvin D. Wilson, Esq.*, and *Melvin H. Wilson, Esq.*, for the petitioner.

*Mark Townsend, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent determined a deficiency of $14,342.52 in the income tax of the petitioner for 1952. Issues for determination are the correctness of the respondent's action in failing to determine that the amounts of $85,000 and $11,272.40, received by petitioner pursuant to certain transactions involving "casinghead gas" contracts, constituted long-term capital gain and were taxable as such.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner is a California corporation, organized in 1912, and has its principal office in Los Angeles, California. It filed its income tax return for 1952 with the district director in that city. During the years involved herein the petitioner kept its books and filed its income tax returns on an accrual basis.

The petitioner's business consists of the processing of casinghead gas, hereinafter sometimes referred to as wet gas, derived from the production of petroleum oils into its separate ingredients, including natural gasoline, dry gas and propane gas, and the operation of a petroleum refinery where natural gasoline is blended with other gasoline and after being refined is purveyed to the public through retail outlets. Its refinery is located at Bakersfield, California. Its processing plants were during 1952 and prior thereto located in Santa Fe Springs, Maricopa, and Signal Hill, California. An important determining factor with respect to profitable operation of a casinghead gas processing plant is the availability of an adequate supply of gas so that the plant may be operated at as nearly as possible its full capacity.

More than 6 months prior to November 1, 1952, petitioner had entered into eight separate contracts with oil producers, hereinafter referred to as producers, for the acquisition by it of casinghead gas produced from drilling operations in the Signal Hill Oil Field. The contracts generally each provided that petitioner was to install and maintain pipelines from producers' wells or gas traps to its Signal

Hill processing plant; that it equip the lines with meters so that accurate account might be kept of all gas emanating from the wells of individual producers; that the producer would deliver the wet gas produced at his wells to the pipeline; that petitioner was to process the gas and pay each producer a percentage of the total gross proceeds derived from petitioner's sale or use of the natural gasoline and propane gas extracted by such processing. The producer had an option to receive payment in kind if he so desired. Upon completion of the processing, petitioner had the right to sell to others all of the product not required to be returned to the producer and thereupon to pay the producer, not being paid in kind, a stipulated percentage of the gross sale price received. Petitioner had the right to and did use natural gasoline so derived in its refinery and to pay the producer an equivalent royalty therefor based upon the market price thereof.

The natural gasoline used by petitioner in its refinery under the contracts referred to was not the identical gasoline resulting from its processing operation. Such gasoline was obtained at its Bakersfield refinery from Standard Oil Company of California through an exchange agreement with that concern. By virtue of the exchange agreement petitioner escaped the cost of transporting its natural gasoline from its processing plant at Signal Hill to the refinery.

The Signal Oil and Gas Company, hereinafter referred to as Signal, owned and operated a processing plant for casinghead gas located in the Signal Hill Oil Field. During the fall of 1952 petitioner determined that the operation of its processing plant in Signal Hill was unprofitable or in danger of becoming so because of an inadequate source of supply of gas and for that reason sought a profitable method of divesting itself of its processing plants and equipment. To that end, in the fall of 1952, it began negotiations with Signal for sale to the latter of its processing plant in Signal Hill. On November 1, 1952, the negotiations culminated in the sale by petitioner to Signal of its Signal Hill processing plant, pipelines, pipes, meters, and fittings in the Signal Hill Oil Field (except the pipelines, pipes, meters, and fittings located on the properties from which wet gas was currently being delivered under the above-mentioned eight contracts with oil producers), together with other properties owned by petitioner consisting of oil leases, interest in lands and gasoline storage and pier facilities located in Santa Barbara County, California.

On the same date, a separate agreement was entered into by petitioner and Signal. This agreement was effected by petitioner's acceptance on November 1, 1952, of the following offer of Signal contained in a letter addressed to petitioner and dated October 29, 1952:

Subject to the conditions and for the considerations hereafter set forth, Signal Oil and Gas Company hereby offers to purchase from you the following properties, to wit:

All leases, gas contracts or other purchase agreements held by Bankline for the purchase or processing of wet gas from properties located in the Signal Hill Oil Field. A schedule of said instruments is hereunto attached and by this reference made a part hereof and marked Exhibit "A."

Signal Oil and Gas Company offers to pay for the above described properties the sum of $85,000.00, plus further sums of money calculated in the following manner:

Signal shall process said wet gas, or cause said wet gas to be processed, at its plant in the Signal Hill Oil Field or at such other plant or plants as Signal shall hereafter elect, whether or not said plants shall be owned and/or operated by Signal. All dry gas resulting from said operations not required to be returned to the properties from which produced shall be sold by Signal and the net sales price paid to Bankline monthly. All natural gasoline and LPG Propane extracted by Signal from said wet gas shall likewise be sold by Signal at the average price it receives for like products sold by Signal, and Signal shall pay Bankline monthly a sum of money equal to the sales price of said natural gasoline and LPG Propane, less the following sums, to wit:

The sum of 2½¢ per gallon on all natural gasoline and the sum of 1¼¢ per gallon on all LPG Propane.

Said deductions are based upon the present price of 8.33¢ per gallon posted by Standard Oil Company of California for 21# R. V. P. natural gasoline in the Signal Hill Oil Field and shall be increased or decreased at the times and in direct proportion to any increase or decrease above or below said price of 8.33¢ per gallon posted by Standard Oil Company of California for 21# R. V. P. natural gasoline in the Signal Hill Oil Field.

Connections shall be established between the wet gas lines presently owned and operated by Bankline and those presently owned and operated by Signal at two locations, to wit: in the proximity of Temple and Hill Streets and in the proximity of Willow and Walnut Streets, Signal Hill, and transmission of said gas shall be made at said points or at other points if in Signal's judgment other connections shall be required. Signal shall also connect its dry gas lines to the dry gas lines presently owned and operated by Bankline in the proximity of Cherry and Willow Streets for delivery of gas to the properties from which it is produced, when such redelivery shall be required. Signal shall meter the wet gas in master meters installed for said purpose and shall make all applicable tests at said points, accounting to Bankline for the entire amount of wet gas received pursuant to this agreement without allocation as to the individual properties from which said gas is produced.

Signal in its operations hereunder shall use the same metering, testing, and accounting procedure currently used by Signal in connection with other wet gas being purchased by Signal in said Signal Hill field and drips secured from the pipe line system of Bankline will be accounted for on the same basis as other drips collected by Signal; provided, however, that such procedures of metering, testing and accounting shall conform with the provisions of the agreements described in Exhibit "A" as modified from time to time by usages and customs in the industry.

This agreement shall remain in full force and effect for the period of ten years from November 1, 1952, and thereafter so long as Signal shall elect. In the event that at any time after ten years from November 1, 1952, Signal shall desire not to receive and/or process the wet gas produced from the properties described in Exhibit "A" it shall give written notice to that effect to Bankline. Within thirty days after said notice Bankline by written notice to Signal may elect to purchase the leases, gas contracts and other purchase agreements herein pur-

chased from Bankline for the sum of $10.00 and have such of said leases and other agreements then remaining in effect reassigned to it, and upon notice to that effect Signal shall reassign all of said leases and agreements. In the event Bankline shall not elect to receive such reassignments, then Signal may without further obligation to Bankline sell or assign said agreements to third parties or may quitclaim, surrender or otherwise terminate any or all of them.

The contracts listed in Exhibit A mentioned in the foregoing agreement were the eight contracts with oil producers heretofore mentioned. Pursuant to the foregoing agreement petitioner on November 1, 1952, executed an "Assignment" which recited that petitioner did thereby assign to Signal "all its right, title and interest in, to and under" the eight contracts.

The payment of the $85,000 amount called for by the agreement was by Signal's non-interest-bearing note, dated December 1, 1952, in that amount providing for installment payments of $4,000 monthly over a 20-month period and a final payment of $5,000. Subsequently, the note was paid in accordance with its provisions.

On November 1, 1952, petitioner and Signal orally entered into another agreement which was reduced to writing on December 1, 1952, and was set out as follows in a letter from Signal to petitioner dated December 1, 1952:

Reference is made to our letter to you dated October 29, 1952, wherein Signal Oil and Gas Company offered to purchase from you certain leases, gas contracts and other purchase agreements held by Bankline for the purchase or processing of wet gas from properties located in the Signal Hill Oil Field, which offer was accepted by you under date of the — day of November, 1952.

Signal Oil and Gas Company hereby agrees to sell and deliver to you natural gasoline in monthly amounts equivalent to the amount of natural gasoline extracted by Signal from the wet gas processed by it under the provisions of the above mentioned letter agreement of October 29, 1952. The term of this agreement shall be ten years from November 1, 1952, and so long thereafter as Signal shall be receiving wet gas produced from the above mentioned wells.

The sales price of all natural gasoline delivered pursuant to this agreement shall be the average price received by Signal during the month in which deliveries are made for natural gasoline of like quality sold by Signal in the Signal Hill Oil Field.

Nothing herein contained shall be construed as requiring us to produce a product of any particular vapor pressure, but delivery shall be made in such product as Signal shall from time to time be producing at the plant in which the above mentioned wet gas is processed.

During the negotiations Signal, for accounting and tax purposes, desired that the $135,000 purchase price for petitioner's properties be broken down and allocated in the contracts herein referred to—$85,000 for the casinghead gas contracts, $25,000 for the processing plant and equipment, and $25,000 for other assets of petitioner. So far as either party was concerned, however, the transactions were taken as a whole and consisted of a "package deal." Petitioner was at first indifferent with respect to an allocation, but later became concerned lest the allo-

cation for the processing contracts be determined to constitute ordinary income. It expressed its concern to Signal and, as a result, that company, by letter also dated December 1, 1952, agreed—

to indemnify and hold Bankline Oil Company harmless from the payment of any greater United States corporate income tax pursuant to Sections 13, 15 and 430 of the Internal Revenue Code on the receipt of said sum of $85,000.00 than the said income tax calculated on said sales price pursuant to Section 117 of said Code.

On its acquisition of petitioner's Signal Hill processing plant, Signal dismantled it but connected its main pipeline to petitioner's former line and thus conducted the wet gas formerly processed by petitioner to its Signal Hill processing plant. A meter was installed by Signal upon its main pipeline and it thereafter accounted to petitioner for the total gas received by that means.

Subsequent to the above transaction petitioner continued to own and maintain the pipelines to the producers and the meters used in connection therewith and made regular meter readings of the gas received from each producer. The petitioner continued to be liable to the producers for royalties on the gas obtained from them and continued to maintain its own royalty records and to compute and to pay royalties due the individual producers.

Generally, petitioner's operations with Signal were carried on as follows:

All the natural gasoline produced by Signal under the contracts with the oil producers was delivered to Standard Oil Company of California under an exchange agreement for the account of petitioner. At petitioner's direction a portion of this gasoline was delivered by Standard Oil Company to one of the producers to satisfy petitioner's obligation to deliver natural gas as a royalty in kind under the contract between petitioner and that producer. A quantity equal to the balance of the natural gasoline produced was delivered by Standard Oil Company to petitioner at the Bakersfield refinery pursuant to an exchange agreement between Standard Oil Company and petitioner.

Signal billed petitioner for the entire amount of natural gasoline extracted by Signal from the wet gas processed under the contracts with the oil producers, and petitioner paid this amount to Signal. Signal then deducted its charges of 2½ cents per gallon from this amount and returned the remaining amount to the petitioner.

The liquid propane extracted by Signal from the wet gas processed under the contracts with the oil producers was sold to third parties by Signal. The total sales price was received by Signal, a charge of 1¼ cents per gallon was deducted, and the remaining amount was paid to petitioner.

The dry gas was handled in the following manner:

A portion of the dry gas was returned to the leases as required by the contracts with the oil producers. Where the dry gas returned to the leases was in excess of the amount required under the contracts, petitioner billed the producers directly and received the proceeds.

A portion of the dry gas was delivered to one of the producers by Signal for the account of petitioner to satisfy petitioner's obligation to deliver dry gas as a royalty in kind under the contract between petitioner and that producer.

The remainder of the dry gas was sold to third parties by Signal and the entire proceeds were remitted to petitioner, as there was no charge for processing dry gas.

Signal, although using less than its total capacity as of the fall of 1952, was operating its Signal Hill processing plant with an adequate supply source of casinghead gas. Its processing of additional gas which it might obtain through petitioner's contracts with producers would be at only a slight increase in its cost of operation. Such gas was unusually rich in that it produced between 8 and 9 gallons of natural gasoline per 1,000 cubic feet of gas. The royalties to producers under petitioner's eight contracts averaged about 42 per cent of the value of natural gasoline and propane gas produced by the processing of wet gas emanating from their wells. In 1952 the going rate of such royalties to all producers in the Signal Hill area was about 55 per cent. Signal believed the production of casinghead gas from wells in this field would remain relatively constant over a number of years.

During 1952 the usual charge in the Signal Hill Oil Field for processing wet gas varied between $0.0075 and $0.0085 per gallon of natural gasoline resulting therefrom. Ordinarily in 1952 in the Signal Hill area a contract to process wet gas was characterized by an agreement to extract natural gasoline, propane and dry gases therefrom for a fixed price per gallon of gasoline thus produced. All products of the extraction process were returned to the owner of the wet gas or other entity having the right to such products. No title to the wet gas passed to the processor. Such contracts were also characterized by provision for their termination on relatively short notice. To pay a processor a bonus for his services was not customary.

On its books Signal treated the November 1, 1952, transaction relating to the eight producers' contracts as constituting the acquisition of a capital asset and has amortized the amount of $85,000 as the cost thereof. Petitioner, on the other hand, on its books has treated the same transaction and Signal's subsequent disposition of the products produced as sales of those products and the amounts retained by Signal as its charges for processing.

The oral agreement which was reduced to writing on December 1, 1952, relative to the sale by Signal to the petitioner of natural gasoline equivalent in amount to that obtained through the eight producers' contracts here involved, was canceled by the parties thereto on October 9, 1957, effective as of October 1, 1957.

The petitioner was not engaged in the business of buying and selling casinghead gas contracts. It had no cost or other basis in the eight producers' contracts involved herein.

The following is a statement computed on an accrual basis showing the results of Signal's and petitioner's operations for the months of November and December 1952, and the years 1953, 1954, and 1955, with respect to the eight producers' contracts involved herein:

|  | 1952 | 1953 | 1954 | 1955 |
|---|---|---|---|---|
| Total value of natural gasoline produced by Signal | $30,557.27 | $243,189.78 | $231,449.15 | $228,378.35 |
| Total amount of propane gas sold third parties by Signal | 666.73 | 5,529.09 | 5,401.10 | 4,814.48 |
| Total amount received by Signal from sale of dry gas not consumed by oil and gas producers nor by Signal | 1,817.14 | 13,997.25 | 13,869.17 | 16,229.30 |
| Total amount of dry gas delivered by Signal as royalty in kind for account of petitioner | 942.66 | 7,201.64 | 7,129.82 | 8,226.81 |
| Total amount of dry gas returned to leases in excess of amounts required by leases | 57.57 | 275.55 | 229.26 | 227.47 |
| Total | 34,041.37 | 270,175.31 | 258,078.50 | 257,876.41 |
| Portion of sales price of natural gasoline and propane gas retained by Signal | 10,235.87 | 79,196.89 | 75,026.84 | 74,772.56 |
| Amounts remitted by Signal to petitioner | 23,805.50 | 190,978.42 | 183,051.66 | 183,103.85 |
| Royalties paid by petitioner (plus fair market value of natural gasoline and dry gas delivered in kind) | 12,454.09 | 96,488.68 | 92,048.81 | 92,638.42 |
| Net amount remaining after petitioner's payment of royalties to producers | 11,351.41 | 94,489.74 | 91,002.85 | 90,465.43 |

In Schedule D of its income tax return for 1952 the petitioner reported a long-term capital gain of $94,440.84 from the sale of capital assets. In an accompanying schedule in explanation of the gain the petitioner showed the sale of 4 automobiles, 2 parcels of real estate, and some casing as having been made on August 31, 1952, and prior thereto during 1952. In further explanation the petitioner showed as having been sold on November 1, 1952, the following: "Signal Hill Absorption plant, State Lease PRC 421, and Bishop Tank farm." The gross sale price of the foregoing was shown in a single amount as $135,000. Also shown in single amounts were depreciation, $973,441.76; cost, $1,013,664.67; and gain, $94,777.09. Concededly, nothing was shown in the return to indicate that the eight producers' contracts involved here, or any of them, had been sold or that any portion of the reported gross sales price of $135,000 had been received for or with respect to the producers' contracts.

After making a field investigation of the petitioner's income tax liability for 1952, the respondent determined that $85,000 of the

$94,777.09 reported by petitioner as long-term capital gain from the sale of the absorption plant, the State lease and the tank farm constituted ordinary income, giving the following explanation in the notice of deficiency for his action:

> You reported as long-term capital gain the sum of $85,000.00 received during the taxable year from Signal Oil and Gas Company under the terms of an agreement dated November 1, 1952, providing for the processing by that corporation of wet gas from certain properties located in the Signal Oil Field District which are covered by your previous agreements with the producers.
>
> It is held that the sum of $85,000.00 received in the taxable year constitutes ordinary taxable income under the provisions of section 22 of the Internal Revenue Code of 1939 instead of long-term capital gain as reported on your return.

Under the processing arrangement with Signal respecting the eight producers' contracts there accrued to the petitioner during the months of November and December 1952 total income in the amount of $11,-351.41. In its income tax return for 1952, the petitioner reported that income as ordinary income. Like income accruing to the petitioner in subsequent years has been so reported by it in its returns for those years.

### OPINION.

The petitioner takes the position that by the arrangement it entered into with Signal on November 1, 1952, it sold its entire interest in the eight producers' contracts here involved to Signal, that those contracts were held for use in its business and not primarily for sale to customers in the ordinary course of its business, that the contracts had been held by it for more than 6 months and that accordingly the $85,000 and the $11,351.41 [1] received by it pursuant to the arrangement represented proceeds received from the sale of capital assets held for more than 6 months and were taxable as long-term capital gain under the provisions of section 117 of the 1939 Code.

The respondent takes the position that the arrangement did not constitute a sale by petitioner of the producers' contracts but at most constituted only an arrangement whereby petitioner contracted with Signal that the latter was to perform for a stated minimum period and at a fixed or determinable charge a portion of the services required of petitioner under the producers' contracts and which portion the petitioner theretofore had performed. Accordingly, the respondent contends that neither the $85,000 nor the $11,351.41 represented proceeds from the sale of capital assets but represented amounts received by the petitioner for actually performing and in effecting performance of the services required of it under the producers' contracts and that consequently both amounts were ordinary income.

---

[1] The amount as stated in petition is $11,272.40. The amount shown by stipulation and used by parties on brief is $11,351.41.

Respecting section 117 the Supreme Court in *Commissioner* v. *P. G. Lake, Inc.*, 356 U. S. 260, 265, said:

The purpose of § 117 was "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See *Burnet v. Harmel*, 287 U. S. 103, 106. And this exception has always been narrowly construed so as to protect the revenue against artful devices. See *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46, 52.

To obtain the benefit of section 117 the taxpayer must bring itself squarely within the terms of the section and all fair doubts are to be resolved against it. *Merton E. Farr*, 11 T. C. 552, affirmed sub nom. *Sloane* v. *Commissioner*, 188 F. 2d 254.

The parties have stipulated that four of the producers' contracts here involved were also involved in *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, which affirmed 33 B. T. A. 910. In that case the petitioner sought deductions for depletion with respect to the gas which it processed during the years 1927, 1928, and 1930 under contracts with producers. In deciding adversely to the petitioner the Supreme Court held that under the contracts the petitioner was not a producer of gas but was "a processor, paying for what it received at the well's mouth," that while "[u]ndoubtedly, respondent [the petitioner] through its contracts obtained an economic advantage from the production of the gas," the contracts granted the petitioner no interest in the gas in place, and that since the petitioner had no capital investment in the mineral deposit which suffered depletion, it was not entitled to the deductions sought. The pertinent portions of the remaining four of the eight producers' contracts involved here are for present purposes substantially the same as those involved in the case decided by the Supreme Court. The parties have stipulated that the petitioner had no cost basis for the eight producers' contracts involved here. Accordingly, we conclude that under the decision of the Supreme Court the petitioner was, as respects all of the eight contracts, "a processor, paying for what it received at the well's mouth," namely, wet or casinghead gas in which it did not have any interest with respect to which depletion deductions were allowable.

Whether, as petitioner contends, it sold its entire interest in the eight producers' contracts to Signal on November 1, 1952, by the arrangement entered into by it and Signal on that date is to be determined from a consideration of the total effect or the substance of the transaction and not its form. *Commissioner* v. *P. G. Lake, Inc.*, *supra; Conrad N. Hilton*, 13 T. C. 623.

Under the producers' contracts the petitioner was obligated to receive at the well's mouth, meter and transmit through pipelines owned and maintained by it and process casinghead gas produced by the various producers and thereupon deliver to the producers in

kind such portions of the resulting products as were required by their respective contracts, sell the remainder of such products and then compute and pay to the respective producers the portion of the proceeds of sale required by their contracts. The portion of the sales proceeds not required to be paid to the producers was retained by petitioner for the work or services it had performed. Unquestionably, under the circumstances presented the net income resulting to petitioner from such work or services prior to November 1, 1952, constituted ordinary income and not capital gain in its hands. Nor does the petitioner contend otherwise here.

Under the arrangement entered into by petitioner and Signal on November 1, 1952, the petitioner continued to receive the casinghead gas from the producers at the well's mouth, meter it and transmit it through pipelines owned and maintained by it to Signal Hill, California, where petitioner formerly had operated its processing plant. At that point Signal received the gas from the petitioner, processed it, made disposition of the products which resulted from processing, and received the proceeds therefrom. In so doing Signal performed some of the work or services formerly performed by petitioner. After its receipt of the proceeds from the disposition of the products resulting from processing, Signal deducted therefrom 2½ cents per gallon for all natural gasoline and 1¼ cents per gallon for all propane gas resulting from the processing and remitted the remainder to petitioner. Thereupon petitioner began performing work or services formerly performed by it, namely, computing and paying to the producers the portion of such receipts required by their respective contracts. From the foregoing it is clear that on and after November 1, 1952, the petitioner performed part of the work or services required under the producers' contracts and Signal performed part of such work or services, with petitioner performing the initial and final portions and Signal performing the intermediate portion.

It is true that the petitioner executed an "Assignment" which recited that petitioner did thereby assign to Signal all of its right, title, and interest in the eight producers' contracts. However, it is also true that under the arrangement of November 1, 1952, if at any time after the expiration of 10 years Signal shall "desire not to receive and/or process" the casinghead gas produced from the properties covered by the porducers' contracts, Signal will not be free to dispose of the contracts immediately in any way it sees fit. If first must give petitioner notice of its "desire not to receive and/or process" any further gas covered by the contracts and then petitioner, upon payment to Signal of the token sum of $10, will be entitled to have the contracts "reassigned" to it. In this connection we think it significant that Signal's profits or gains from the contracts are limited solely to the amounts receivable by it under the arrangement of November 1, 1952,

486

with respect to the natural gasoline and propane gas which result from its processing of the casinghead gas.

As shown by our findings, petitioner's and Signal's operations under the arrangement of November 1, 1952, have resulted in the petitioner receiving the greater share of the net profits arising from such operations.

On its books the petitioner has treated as its sales Signal's disposition of the products resulting from the processing of the casinghead gas and treated the amounts retained by Signal as Signal's charges for processing the gas. The petitioner contends here that such treatment on its books was erroneous and was utilized merely to simplify the manner of accounting for the payments to be made by petitioner to the producers under their contracts. In support of its contention the petitioner relies on the testimony of, among others, Verne Harrell, who at the time of the trial was vice president and treasurer of the petitioner, and who during the fall of 1952 was vice president of the petitioner and in charge of its accounting records. He is and during 1952 was a certified public accountant. His testimony is to the effect that although he did not examine the writings involved in the arrangement entered into by petitioner and Signal on November 1, 1952, he was advised by petitioner's president that petitioner had sold to Signal its Signal Hill processing plant and its gas processing contracts in the Signal Hill field effective November 1, 1952; that the casinghead gas formerly processed in petitioner's Signal Hill plant thereafter would be processed by Signal but that petitioner would continue to be obligated to pay to the producers their royalty share of gasoline and propane; that he thereupon formulated the accounting procedure by which petitioner on its books has treated as its sales Signal's disposition of products and treated the amounts retained by Signal as Signal's charges for processing the gas; and that such procedure was employed to account for the gross proceeds or gross value of the gasoline, propane and dry gas in order to compute the amounts due the producers under their contracts. It is observed that Harrell's testimony offers no explanation as to why, if the contracts had been sold to Signal as he stated he had been advised, he, as a certified public accountant, found it either necessary or desirable to formulate an accounting procedure indicating the contrary merely in order to compute the amounts due the producers under their respective contracts.

From a consideration of all of the evidence bearing on the character of the transaction of November 1, 1952, between petitioner and Signal, we are of the opinion that the total effect or substance of the transaction was merely an arrangement whereby petitioner employed Signal for at least a period of 10 years and at a fixed or determinable compensation to perform a portion of the work or services required

of petitioner by the eight producers' contracts and which portion the petitioner theretofore had performed. But arrangements whereby one is engaged to render services to or for another are not capital assets. *General Artists Corporation*, 17 T. C. 1517, affd. 205 F. 2d 360, certiorari denied 346 U. S. 866; *David L. Gordon*, 29 T. C. 510; *Thurlow E. McFall*, 34 B. T. A. 108. Accordingly, we conclude that the transaction of November 1, 1952, respecting the producers' contracts was not a sale of capital assets as petitioner contends.

The evidence shows that the compensation to Signal provided for in the arrangement of November 1, 1952, was especially favorable to Signal and that even though Signal paid petitioner $85,000 in accordance with the arrangement, Signal's operations thereunder have been quite profitable to it. As we view the matter, the payment of $85,000 by Signal represented a payment to compensate petitioner in some measure for the lessened sums that would result to it because of the especially favorable compensation provided for Signal under the arrangement. As such, it was ordinary income to the petitioner.

With respect to the $11,351.41, which remained in petitioner's hands after paying from the proceeds received from Signal on account of the November and December 1952 operations, the amounts due the various producers, we think the following statement from *General Artists Corporation, supra,* is applicable:

If one person, originally employed to do work, has another do the work, with the consent of the employer, for a part of the charge, the entire amount received is still ordinary income. * * *

*Decision will be entered for the respondent.*