Samuel Melnick and Ida Melnick v. Commissioner.
Melnick v. Commissioner
Docket No. 65926.
United States Tax Court
T.C. Memo 1960-93; 1960 Tax Ct. Memo LEXIS 200; 19 T.C.M. (CCH) 490; T.C.M. (RIA) 60093; May 9, 1960
*200 Held, that petitioner did not receive at least 80 per cent of informer's fees from the State of Pennsylvania in one taxable year, and therefore is not entitled to the benefits of section 107(a) of the Internal Revenue Code of 1939. Samuel Melnick, pro se, 1436 Land Title Building, Philadelphia, Pa. Paul D. Ritter, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion
*201 ATKINS, Judge: The respondent determined deficiencies in income tax of the petitioners for the years 1952 and 1953 in the amounts of $22,550.25 and $4,005.66, respectively. The primary issue is whether petitioner is entitled to the benefit of section 107(a) of the Internal Revenue Code of 1939 with respect to informer's fees received in those years. By amendment to his answer filed after the hearing the respondent alleges that there should be in-included in the petitioners' income for 1952 and 1953 the respective amounts of $47,000 and $24,830.84 as informer's fees, and makes claim for an increased deficiency for 1953. Findings of Fact Most of the facts are stipulated and the stipulation is incorporated herein by this reference. The petitioners filed joint income tax returns for the calendar years 1952 and 1953 with the director of internal revenue at Philadelphia, Pennsylvania. Ida Melnick is involved herein only by reason of having filed joint returns with her husband, and Samuel Melnick will be hereinafter referred to as petitioner. On February 23, 1937, the petitioner, acting through a nominee, Louis Lipschitz, furnished information to the secretary of the department *202 of revenue of the Commonwealth of Pennsylvania, revealing that Joseph Binenstock was in possession of funds which properly belonged to the Commonwealth of Pennsylvania by operation of the Pennsylvania laws of escheat. On November 30, 1939, the Commonwealth of Pennsylvania appointed two escheators, Frank F. Truscott and Thomas H. Lee, to represent it in all action to be undertaken in regard to the information furnished by petitioner regarding Binenstock's possession of funds belonging to the Commonwealth. [1]
*203 On December 20, 1939, the petitioner and Lipschitz entered into an agreement whereby Lipschitz, in recognition of the fact that petitioner was the real and actual informant, and that he, Lipschitz, was the informant of record only at the request of petitioner in order that petitioner's identity should not be disclosed, agreed to execute forthwith and deliver to the petitioner a written assignment of any informer's fees which he might become entitled to receive as the informant of record, and forthwith to authorize the secretary of the department of revenue to pay any such informant's fees to the petitioner. This agreement contained the following provision: "That out of said informant's fee Melnick will pay to Lemuel B. Schofield, Esquire, for his services as attorney for the informant, to said Louis Lipschitz for allowing his name to be used as informant and to become Melnick's nominee, as aforesaid, to Manuel Fleisher, Esquire, for his assisting Melnick in procuring the appointment and commissioning of escheators, and Melnick will retain for himself for all of his own services and efforts as the real informant, for procuring the appointment and commissioning of escheators, for *204 preparing the escheat petition, for his aid and assistance to the escheators, etc. whatever percentages or proportions of said informant's fee all of the aforementioned persons, to wit, Samuel Melnick, Lemuel B. Schofield, Esquire, Louis Lipschitz, Esquire, and Manuel Fleisher, Esquire, will agree upon, said agreement to be unanimous." In June 1943, suit was instituted by the escheators to have the funds held by Binenstock declared escheatable. On December 6, 1949, it was adjudged that Binenstock was in possession of funds which properly belonged to the Commonwealth of Pennsylvania, and judgment was entered against Binenstock in the amount of $864,924.21. This judgment was affirmed by the Supreme Court of Pennsylvania on March 22, 1951. During this period of litigation petitioner prepared pleadings, briefs and legal papers, made investigations, interviewed witnesses, gathered information, and performed all types of services for the escheators except trying and arguing the case. After entry of the judgment Binenstock represented to the Commonwealth that he he did not have sufficient funds to pay the judgment, and on October 17, 1951, the Commonwealth entered into an agreement *205 with him whereby the Commonwealth agreed to accept the amount of $756,000, plus interest, in settlement of the judgment. The agreement provided for an initial payment of $250,000 and the payment of the balance in 34 monthly installments beginning on October 1, 1951, the first 33 installments to be in the amount of $15,000 each, and the 34th and final installment to be in the amount of $11,000. Interest was to be paid contemporaneously with each monthly installment. [2] Binenstock died on March 12, 1952. *206 Pursuant to the settlement agreement, Binenstock and his estate made payments in 1952 to the Commonwealth of Pennsylvania in the amount of $442,587.52. In 1952 the Commonwealth of Pennsylvania issued a check to Lipschitz in the amount of $88,868.99 as informer's fees. This amount was disbursed as follows: $11,240.43 to Lemuel B. Schofield to be held in escrow. $428.56 to Louis Lipschitz to be held in trust. $47,000 to Samuel Melnick, the petitioner. $17,700 to Lemuel B. Schofield. $3,000 to Louis Lipschitz. $9,500 to Manuel Fleisher. With respect to the item of $11,240.43 above mentioned, an escrow agreement was entered into by Schofield, Truscott, Lee, and the petitioner. By its terms Schofield was to hold this money until it was decided whether Truscott or Lee or both were to receive any portion, and the petitioner could not take any of this money out of the escrow until the decision was made. On August 6, 1953, Binenstock's estate paid the Commonwealth of Pennsylvania an amount of $102,464.25. On or about August 19, 1953, the Commonwealth paid $20,749.01 as informer's fees. On August 19, 1953, petitioner, Lipschitz, Fleisher, and Schofield entered into an *207 agreement which provided as follows: "As the fees are received from the Commonwealth we have agreed that they will be divided among us in accordance with the percentage the respective amounts we each expect to receive bear to the total amount expected to be received, as follows: "Melnick
67.05 per cent
Lipschitz
4.81 per cent
Fleisher
13.47 per cent
Schofield
14.67 per cent" In such agreement Schofield was authorized to pay out of the $11,240.43 held by him in escrow as described above, an amount of $5,400 to Truscott and Lee, of which $4,500 was in settlement of their claims for participation in the informer's fees and $900 was in payment for certain expenses. It was therein agreed that the balance of $5,840.43, as well as the $428.56 held by Lipschitz in trust, and the $20,749.01 received from the Commonwealth in 1953 should be shared by the four in the above proportions. Adjustment was made in such agreement so that the amounts of informer's fees previously distributed in 1952 should be shared in the above proportions. The $5,400 was duly paid to Truscott and Lee and the balance of $5,840.43 as well as the $428.56 held by Lipschitz became available for distribution *208 in accordance with the agreement. On August 19, 1953, the amounts of $20,749.01, $5,840.43, and $428.56, referred to above, were distributed in accordance with the agreement as follows (Schofield having already received in the 1952 distribution more than his agreed percentage): $ 1,601.66 to Louis Lipschitz $ 4,538.16 to Manuel Fleisher $20,878.17 to Samuel Melnick, the petitioner On October 30, 1953, a further amount of $26,370.61 was paid by Binenstock's estate to the Commonwealth of Pennsylvania. Subsequent to October 30, 1953 and prior to December 18, 1953, the Commonwealth paid $5,340.05 as informer's fees, of which the petitioner received $3,952.67 on December 18, 1953. In 1954 Binenstock's estate paid an additional amount of $60,000 to the Commonwealth. During that year the Commonwealth paid $13,668.75 as informer's fees, of which the petitioner received $9,774.42. In 1955 Binenstock's estate paid the Commonwealth an additional amount of $37,500. In that year the Commonwealth paid informer's fees in an undisclosed amount, of which the petitioner received $3,054.99. Thus the amounts of escheat payments to the Commonwealth, the portions thereof paid as informer's *209 fees, and the amounts actually received by the petitioner in the years 1952 through 1955, were as follows: Informer's
Amts. of In-
Escheat Pay-
Fees Paid
former's Fees
ments to the
by Common-
Actually Re-
Year
Commonwealth
wealth
ceived by Pet.
1952
$442,587.52
$ 88,868.99
$47,000.00
1953
128,834.86
26,089.06
24,830.84
1954
60,000.00
13,668.75
9,774.42
1955
37,500.00
Not Shown
3,054.99
Total
$668,922.38
$128,626.80
$84,660.25 There remained to be paid to the Commonwealth after 1955, $87,077.62 of principal escheat payments under the settlement agreement. The full amount had not been paid at the time of the hearing in June 1959. In his joint income tax return for 1952, the petitioner reported the receipt of $58,240.43 as informer's fees, which amount was made up of $47,000 which he actually received in that year, and the amount of $11,240.43 held by Schofield in escrow. In such return the petitioner, pursuant to section 107(a) of the Internal Revenue Code of 1939, treated the amount of $58,240.43 as if it had been received in the year 1937 and over the period 1940 to 1952, thus allocating $4,160.03 to each of the 14 years, *210 including the year in question, 1952. In his joint income tax return for the year 1953, the petitioner reported receipt of $13,161.85 as informer's fees. In such return the petitioner treated this amount as having been received in the year 1937 and over the period 1940 to 1953, inclusive, allocating an amount of $877.46 to each year, including the taxable year 1953. In his joint income tax return for the year 1954, the petitioner reported the receipt of informer's fees in the amount of $9,744.42, which he similarly spread over prior years and the taxable year 1954. On January 13, 1953, the petitioner addressed a letter to the respondent, requesting a ruling as to whether he was entitled to the benefits of section 107(a) of the 1939 Code, in reporting his income from informer's fees for the year 1952. By letter dated February 17, 1953, the respondent requested further information. By letter dated February 20, 1953, the petitioner furnished the respondent certain requested information and a statement of the informer's fee of $88,868.99 paid by the Commonwealth in 1952 and the distribution thereof as shown in our facts above. The petitioner did not inform the respondent in such *211 letter that additional informer's fees were expected to be received in subsequent years. By letter dated March 10, 1953, addressed to the petitioner, the respondent expressed the opinion, based upon the facts as submitted, that the petitioner received infomer's fees in 1952 of $58,240.43 to which the provisions of section 107(a) were applicable. In the notice of deficiency the respondent took the position that the petitioner was not entitled to the benefit of section 107(a) of the 1939 Code as to informer's fees received in 1952 and 1953. He determined that the petitioner was taxable in 1952 on informer's fees of $59,586.66 (this being 67.05 per cent of $88,868.99). For 1953 the respondent determined that the petitioner was taxable upon informer's fees of $14,244.18. Opinion Whether, for either of the years 1952 or 1953, the petitioner is entitled to the benefit of section 107(a) of the Internal Revenue Code of 1939[3] depends upon whether in either of those years he received at least 80 per cent of his total informer's fees for information furnished by him to the Commonwealth of Pennsylvania with regard to escheatable funds held by Binenstock. The respondent has raised no other *212 question with respect to the applicability of section 107(a). On brief he concedes that the petitioner has met the requirement of having rendered personal services for a period of 36 calendar months or more. The petitioner's argument on brief is that in each of the years 1952 and 1953 he received all of the informer's fees to which he was entitled during those years. He testified that he did not know in any particular year whether he would receive any further informer's *213 fees, since this would depend upon whether the Binenstock estate would be able or willing to pay escheatable funds to the Commonwealth as had been agreed. He argues that under these circumstances he is entitled to the benefit of section 107(a). The petitioner misconstrues section 107(a). That section is applicable only if at least 80 per centum of the total compensation for the personal services rendered over the period of 36 months or more is received or accrued in one taxable year. This is the view taken in the regulations, [4] which clearly reflect the purpose of Congress. Indeed, the language of the regulations quoted in the margin paraphrases the language appearing in S. Rept. No. 1631, 77th Cong., 2d Sess., p. 108, 1942-2 C.B. 586, with respect to section 139(a) of the Revenue Act of 1942, which amended section 107(a) of the Code. *214 Our first concern then is to determine the total amount received by the petitioner as informer's fees arising out of the Binenstock information, and the amount which he received in each of the years 1952 and 1953. While there is no specific evidence to show the petitioner's method of accounting, we are justified in assuming it to have been the cash receipts and disbursements method, particularly since both parties proceed upon that assumption. The evidence shows that over the period 1952 through 1955 the total amount actually received by the petitioner was $84,660.25. Apparently no payments were made prior to 1952. The parties are at odds as to the amounts actually or constructively received by the petitioner in each of the years 1952 and 1953. In the notice of deficiency the respondent determined that the petitioner received $59,586.66 in 1952 and $14,244.18 in 1953. By an amendment to his answer, the respondent now contends that there should be included in petitioner's income for those years the amounts actually received, namely, $47,000 and $24,830.84, respectively. In his return for the year 1952, the petitioner reported the receipt of informer's fees in the amount of $58,240.43, *215 this being the amount actually received, $47,000, plus the amount of $11,240.43 held in escrow by Schofield. In his return for the year 1953 the petitioner reported the receipt of informer's fees in the amount of $13,161.85. On brief petitioner makes the statement that in 1952 and 1953 the Commonwealth paid him informer's fees of $88,868.99 and $26,089.06, respectively, but states elsewhere in the brief that he actually received in those years only the amounts of $47,000 and $24,830.84, as we have found. We have set forth in some detail in our Findings of Fact the contractual arrangements between the petitioner and Lipschitz, and among the petitioners, Lipschitz, Schofield, and Fleisher. While the evidence shows that the petitioner was the real and actual informer, it appears that Lipschitz was the nominal informer and the one recognized by the Commonwealth. Although in the contract of December 20, 1939, Lipschitz agreed to execute a written assignment of any informer's fees to the petitioner and to authorize the secretary of the department of revenue of Pennsylvania to pay the fees to the petitioner, this quite apparently was not done, since the evidence shows that Lipschitz received *216 the check for $88,868.99, the informer's fees, from the Commonwealth in 1952. Furthermore, the contract of December 20, 1939, indicates that Schofield, Fleisher, and Lipschitz also had some claims to the informer's fees as paid, the percentages to be agreed upon later. In the contract of August 19, 1953, the percentages were agreed upon, the petitioner's share being 67.05 per cent, and therein it was also agreed that the escheators were entitled to a part of the fee paid in 1952. Of the informer's fees paid by the Commonwealth in 1952, the amount of $11,240.43 was held in escrow by Schofield, and the amount of $428.56 was held in trust by Lipschitz. The petitioner testified that he could not withdraw any of the escrow funds, and it was not until 1953 that the trusteed funds and the funds in escrow became available for distribution in the proportions which the parties had agreed upon. Under the circumstances, we do not think that the receipt of the informer's fees by Lipschitz was tantamount to receipt by the petitioner, as would ordinarily be true in the case of receipt by an agent. It is our conclusion that in 1952 there was not such a right in the petitioner to demand the full fee, *217 or even 67.05 per cent thereof, as to result in the constructive receipt thereof by him in that year of any amount over the amount actually received by him. See Merton E. Farr, 11 T.C. 552, affd. (C.A. 6) sub nom., Sloane v. Commissioner, 188 F. 2d 254, and North American Oil Consolidated v. Burnet, 286 U.S. 417. We accordingly hold that the petitioner was in receipt of informer's fees in 1952 and 1953 in the respective amounts of $47,000 and $24,830.84, which were the amounts he actually received. It will readily be seen that in neither 1952 nor 1953 did the informer's fees received by the petitioner amount to as much as 80 per cent of his total informer's fees of $84,660.25 actually received over the years 1952 through 1955. Accordingly, section 107(a) does not apply. It may be added that even if, as claimed by the petitioner in his return, it were considered that he received informer's fees of $58,240.43 in 1952, this would still be less than 80 per cent of the total informer's fees received by him. And even if it were considered that the petitioner, being the real informer, had received the full amount of informer's fees paid by the Commonwealth *218 in each of the years, neither the amount of $88,868.99 paid in 1952 nor the amount of $26,089.06 paid in 1953 would constitute as much as 80 per cent of the total informer's fees of $131,681.79 paid by the Commonwealth over the years 1952 through 1955. In addition, it may be pointed out that after 1955 there remained a large sum due by Binenstock's estate to the Commonwealth, and that, if paid, the petitioner would be entitled to additional informer's fees. It thus appears that under no possible view would the petitioner be entitled to the benefit of section 107(a). We hold that there should be included in the petitioner's taxable income for the years 1952 and 1953 informer's fees in the respective amounts of $47,000 and $24,830.84. The petitioner refers to the fact that the respondent by ruling letter of March 10, 1953, advised him that for the year 1952, he was entitled to the benefits of section 107(a), and contends that in view of such letter he should not be penalized, at least by the imposition of penalties or interest for the years in question. The respondent is not bound by an erroneous ruling, particularly where, as here, the petitioner did not make a full disclosure of *219 all the pertinent facts. See Avco Manufacturing Corporation, 25 T.C. 975, remanded pursuant to settlement stipulation (CA 2) - F. 2d -, and Automobile Club of Michigan v. Commissioner, 353 U.S. 180. It may be added that the respondent has not determined any "penalties;" and that this Court has no jurisdiction over matters relating to interest. Gussie P. Chapman, 14 T.C. 943, affd. (CA 9) 191 F. 2d 816, and Commissioner v. Kilpatrick's Estate, 140 F. 2d 887, affirming a Memorandum Opinion of this Court. Decision will be entered under Rule 50. Footnotes
1. Section 614, Title 72, Purdon's Penna. Statutes Annotated, provides for the appointment of escheators by the department of revenue. Until amended in 1953 this section provided that escheators should receive 15 per cent of all moneys paid into the state treasury from the sale of escheated property, together with expenses. The amendment in 1953 provided for a graduated rate of compensation for escheators. Section 1304 of such title, until amended in 1953, provided that any person who should first inform the department of revenue in writing that any escheat had occurred and who should procure necessary evidence to substantiate the fact of escheat, and would prosecute the right of the Commonwealth to the property escheated with effect, should be entitled to one-fourth of the proceeds of all property declared to have escheated, after deducting, among other things, all proper costs and charges incident to the establishing of such escheat and the converting of the escheated property into money. The amendment made in 1953 provided for a graduated fee for informers, representing diminishing percentages based upon all property declared escheated, after deducting, among other things, all costs of establishing the escheat and converting the escheated property into money, including any fees provided by law for the compensation of escheators and attorneys.↩
2. Binenstock did not have assets in his own name sufficient to meet the payments under the settlement agreement. However, he had owned all the stock, 325 shares, of J. A. Doughtery's Sons, Inc., Distillers, which he had transferred in trust for the benefit of his daughters in 1947. Binenstock sought to obtain from the corporation funds necessary for payment to the Commonwealth, and the matter was presented to the Orphans Court of Philadelphia County. That court, recognizing that the transfer of the stock by Binenstock was invalid under the Uniform Fraudulent Conveyance Act, authorized the trustees of the trust to permit the corporation to lend Binenstock or his estate sufficient money to meet the payments of principal, $756,000 and interest due under the petitioner's compromise with the Commonwealth. Some of the payments made by Binenstock and his estate under the compromise agreement were made with funds borrowed from the corporation and some were made with cash which Binenstock had and with proceeds of liquidation of real estate owned by Binenstock.↩
3. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY. (a) Personal Services. - If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.↩
4. Section 39.107-1 of Regulations 118 provides in part: * * * Thus, for example, if an individual who makes his returns on a calendar year basis and on the basis of cash receipts and disbursements commences personal services on February 17, 1949, and completes them on July 1, 1952, and is paid $8,000 for such services on the completion date, he is entitled to the benefits of section 107(a), provided the $8,000 is at least 80 percent of the total compensation paid or to be paid to such individual for such services; and the tax attributable to the $8,000 received in 1952 and included in the individual's gross income for such year shall not be greater than the tax attributable to such amount, had it been received ratably over the calendar months included in the period from February 17, 1949, to July 1, 1952. However, if such individual receives an additional $5,000 in 1953 for such services, he is not entitled to the benefits of section 107(a)↩ with respect to either the $8,000 or the $5,000, for the reason that he does not receive in one taxable year at least 80 percent of the total compensation for such services. * * *