T.C. Memo. 2015-164

UNITED STATES TAX COURT

EDWARD N. TOBIAS AND SUZANNE M. KOEGLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21510-13.                    Filed August 18, 2015.

Edward N. Tobias and Suzanne M. Koegler, pro sese.

<u>Kristina L. Rico</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>: The Internal Revenue Service (IRS or respondent) deter-mined a deficiency of $76,359 in petitioners' 2010 Federal income tax.[1] After

_____

[1] All statutory references are to the Internal Revenue Code (Code) in effect for the tax year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round most monetary amounts to the nearest dollar.

[*2] concessions,[2] the issues for decision are: (1) whether petitioners are taxable on a withdrawal from a variable annuity contract; (2) whether petitioners are liable under section 72(q) for a 10% penalty for a premature distribution from that annuity contract; and (3) whether respondent may amend his answer to assert, and whether petitioners are liable for, the accuracy-related penalty. We resolve all issues in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and the accompanying exhibits here by reference. Petitioners resided in New Jersey when they petitioned this Court.

In 2010 petitioner-husband was self-employed as an attorney and petitioner-wife was employed full time as a school administrator. Petitioner-husband holds an inactive C.P.A. license. Petitioner-wife suffers from rheumatoid arthritis, with which she was diagnosed before 2010. Her illness caused her to retire from full-time work in late 2013.

In April 2003 petitioners purchased a variable annuity from Allstate Life Insurance Company (Allstate) for an initial investment of $228,800. In order to

---

[2]Respondent determined, and petitioners concede, that petitioners omitted from their 2010 return $55 of interest income and $20 of dividend income.

[*3] make this purchase, petitioners sold, at a loss of $158,000, securities that petitioner-wife had inherited from her parents several years previously. Between 2003 and 2006 petitioners made additional after-tax investments of $346,154 in the Allstate annuity contract.

In March 2007 petitioners surrendered the Allstate annuity and transferred the proceeds to a variable annuity from ING USA Annuity & Life Insurance Company (ING). The value of the Allstate annuity at that time was $794,493, reflecting petitioners' investment of $574,954 ($228,800 + $346,154) and $219,539 in accrued earnings. Because Allstate passed the proceeds directly to ING, this transfer qualified as a nontaxable like-kind exchange under section 1035. Petitioners thus retained the same principal and accrued earnings amounts in the ING annuity, which had an annuity starting date of February 3, 2047.

On November 16, 2010, petitioners withdrew $525,000 from the ING annuity to fund the purchase of (and later improvements to) their current residence. At the time of this distribution, the cash value of the annuity was $761,256 and the accrued earnings were $186,302. When making this withdrawal, petitioners declined to have any tax withheld. At year end 2010 ING issued to petitioners a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., reflecting this withdrawal. The

[*4] Form 1099-R reported the taxable amount as $186,302 and listed the distribution code for "early distribution, no known exception."

Petitioners jointly filed their 2010 Federal income tax return on October 21, 2011. They did not report any retirement income on this return. Instead, they included a Form 4852, Substitute for Form W-2, Wage and Tax Statement, or Form 1099-R, noting the $525,000 withdrawal and checking the box for "taxable amount not determined." They offered this explanation:

> The [ING annuity] account was funded with after-tax funds and all withdrawals have been made prior to annuitization. Accordingly, any potential gains should be applied to the prior capital loss carryforward, which is approximately ($148,000). Additionally, this account has not recouped losses incurred in prior years and has incurred substantial withdrawal penalties; the calculation made by ING is incorrect and is contested.

Petitioners did not attach to their return Form 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, which provides the vehicle for claiming an exception to the section 72(q) penalty for premature distributions from annuity contracts.

Petitioners' 2010 return included a Schedule D, Capital Gains and Losses, that reported a $148,396 long-term capital loss carryforward from prior years. On line 13 of their 2010 return petitioners deducted $3,000 of this loss against ordinary income. They had done the same every year since 2003.

**[\*5]**  The IRS initiated an examination of petitioners' 2010 return due to the mismatch between their reported retirement income and the amount shown on the Form 1099-R that ING supplied.  Upon completion of the audit, the IRS increased petitioners' taxable retirement income by $186,301[3] and imposed under section 72(q) a penalty of $18,630 on the premature distribution.  The IRS mailed petitioners a timely notice of deficiency, and they timely petitioned this Court.

In his pretrial memorandum respondent indicated that he intended to file a motion for leave to amend the answer to assert under section 6662 a 20% accuracy-related penalty for a substantial understatement of income tax.  When making this motion at trial, respondent did not offer any reason for failing to assert the penalty previously.  Petitioners objected, contending that their return position was legally justified; they did not argue or present evidence that they would be prejudiced if we granted respondent's motion, which we took under advisement.

OPINION

I.     Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer has the burden of proving them erroneous.

---

[3]The retirement income reported on the Form 1099-R was $186,301.59, and the IRS evidently rounded this down to $186,301.

**[\*6]** Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.[4]

II.    <u>Taxability of Annuity Withdrawals</u>

A.    <u>Statutory Background</u>

The Code provides that "gross income means all income from whatever source derived, including (but not limited to) * * * [a]nnuities." Sec. 61(a)(9). An annuity is a contract to receive future periodic payments; the purchaser pays premiums that the annuity provider invests, generating income to cover the promised future payments. <u>See</u> sec. 1.72-2(b)(2), Income Tax Regs. Gains on investments within an annuity are not taxed until the purchaser receives distributions; this allows earnings within the annuity to build up at a faster rate. <u>See</u> sec. 72; 1 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates, and Gifts, para. 12.1.2, at 12-5 (3d ed. 1999).

---

[4]Section 6201(d) provides that the IRS in certain circumstances cannot rely solely on information returns to establish unreported income but "shall have the burden of producing reasonable and probative information" in addition thereto. This provision applies only where the taxpayer "asserts a reasonable dispute with respect to any item of income reported on an information return." Petitioners have not asserted a "reasonable dispute" concerning the amount of the distribution they received from ING. Nor have they alleged that ING made any factual error in calculating the taxable portion of this distribution.

**[*7]** Every annuity has an "annuity starting date" on which regular annuity payments are scheduled to begin. See sec. 1.72-4(b), Income Tax Regs. Payments received after the annuity starting date are taxed in a manner allowing the taxpayer's "investment in the contract" to be recovered on a pro rata basis as each annuity payment is received. Sec. 72(a) and (b); secs. 1.72-1(c), 1.72-4(a), Income Tax Regs. The taxpayer's "investment in the contract" is "the aggregate amount of premiums or other consideration paid for the contract," less any amounts already received under the contract that were excluded from gross income. Sec. 72(c)(1), (e)(6).

Payments received under an annuity contract before the annuity starting date are likewise included in the recipient's income, but the taxable portion is calculated differently. The "income-first" rule of section 72(e) provides that payments received before the annuity starting date "shall be included in gross income to the extent allocable to income on the contract." Sec. 72(e)(2)(B). This amount is calculated by subtracting the recipient's "investment in the contract" from the cash value of the contract immediately before the distribution is received, disregarding any surrender charges. Sec. 72(e)(3)(A). The recipient is thus taxed on the full amount of the distribution or the full amount of earnings accrued in the annuity

[*8] contract, whichever amount is less. If the distribution exceeds the accrued earnings, the balance is treated as a tax-free return of basis. Sec. 72(e)(3)(B).

## B.    Taxability of Petitioners' Withdrawal

The ING annuity contract is subject to section 72. The parties stipulated that the contract had an annuity starting date of February 3, 2047. Because petitioners received the 2010 distribution before the annuity starting date, it is governed by the income-first rule of section 72(e).

Petitioners paid total premiums of $574,954 toward the Allstate annuity. After surrendering the Allstate annuity, petitioners paid no premiums and made no contributions toward the ING annuity, and they received no distributions from either annuity prior to 2010. Consequently, petitioners' "investment in the contract" under the ING annuity was $574,954 at the time of their withdrawal.[5]

On November 16, 2010, the day petitioners made their withdrawal, the cash value of the ING annuity contract was $761,256. Petitioners thus had $186,302 of "income on the contract" (cash value of $761,256 minus their "investment in the contract" of $574,954). Because the amount of the withdrawal, or $525,000, ex-

---

[5]When Allstate passed the full value of the surrendered annuity to ING on petitioners' behalf, they recognized no gain or loss under section 1035 and retained the same basis (principal) and accrued earnings amounts in the new annuity. See secs. 1.1031(d)-1(a), 1.1035-1(c), Income Tax Regs.

**[*9]** ceeded their "income on the contract," section 72(e)(2)(B)(i) required that they include the latter amount in gross income for 2010. The balance of the distribution constituted a tax-free recovery of basis.

Petitioners urge that this calculation fails to take into account the $158,000 capital loss they realized in 2003 when they sold securities to raise funds to acquire the Allstate annuity. Much of the "income on the contract," they say, likely results from capital gains realized by Allstate and ING. Petitioners insist that they "made no money" on the entire set of transactions and that the $158,000 capital loss from 2003 should therefore serve to offset the income inclusion that the 2010 distribution would otherwise generate.

This argument is unpersuasive for at least two reasons. Petitioners' "investment in the contract," which determines the amount taxable under section 72(e)(2), is "the aggregate amount of premiums or other consideration paid for the contract." Sec. 72(e)(6)(A). The aggregate amount of premiums petitioners paid for the contract was $574,954. They have suggested no statutory rationale for increasing this figure to $732,954 on account of losses they incurred when generating funds to make the initial premium payment.[6]

---

[6]Petitioners' argument that their investment in the contract should be increased to account for their prior capital losses also contradicts their own return

(continued...)

[*10] There is likewise no support for petitioners' contention that their 2010 withdrawal should be characterized as capital gain rather than ordinary income. It is irrelevant to what extent petitioners' "income on the contract" may have derived from capital gains realized by Allstate or ING. Section 72 mandates the inclusion of annuity payments in petitioners' hands as ordinary income. Their assertion that section 72 is inapplicable because they intended to use the annuity as an "investment vehicle" rather than as a source of retirement income is without merit. Section 72 explicitly applies to all annuities regardless of the purchasers' intent.

III.    Section 72(q) Penalty

In the case of any premature distribution from an annuity contract, section 72(q)(1) generally imposes a penalty "equal to 10% of the portion of such amount which is includible in gross income." Petitioners argue that this penalty does not apply because their distribution falls within the exception set forth in section 72(q)(2)(C) for distributions "attributable to the taxpayer's becoming disabled within the meaning of subsection (m)(7)." Section 72(m)(7) provides that a person shall be considered "disabled" if he or she is:

---

[6](...continued)
position. On their 2010 Schedule D they reported the $148,396 remnant of the 2003 capital loss as a long-term capital loss carryforward and deducted $3,000 of this loss, the maximum amount allowed, against ordinary income. See sec. 1211.

[*11] unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be disabled unless he furnishes proof of the existence thereof in such form and manner as the Secretary may require.

The regulations provide that "[a]n individual will not be deemed disabled if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity." Sec. 1.72-17A(f)(4), Income Tax Regs.; see Dwyer v. Commissioner, 106 T.C. 337 (1996); Dollander v. Commissioner, T.C. Memo. 2009-187. Whether an impairment constitutes a "disability" is to be determined by considering all of the facts in the case. Sec. 1.72-17A(f)(2), Income Tax Regs.

Petitioners contend that petitioner-wife was "disabled" in 2010 by her rheumatoid arthritis. However, she was employed full time throughout 2010 as a school administrator. Petitioners' tax return shows that, apart from the annuity withdrawal, her employment was petitioners' primary source of income during 2010. Although her illness undoubtedly placed certain limits on her, she clearly was not "prevented by the impairment from engaging in * * * substantial gainful activity." Sec. 1.72-17A(f)(4), Income Tax Regs. Petitioner-wife during 2010

[*12] was therefore not "disabled" within the meaning of section 72(q)(2)(C). Because petitioners do not urge that any other exception applies, we will sustain respondent's imposition of an $18,630 penalty under section 72(q)(1).

## IV. Accuracy-Related Penalty

Respondent did not determine an accuracy-related penalty in the notice of deficiency or assert one in his answer. At the start of trial, respondent moved to amend his answer to assert this penalty. The Court took that motion under advisement.

Rule 41(a) provides that, when more than 30 days have passed after an answer has been served, "a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires." Whether a party may amend his pleading lies within the sound discretion of the Court. Estate of Quick v. Commissioner, 110 T.C. 172, 178 (1998). In determining whether to allow a proposed amendment, the Court must consider (among other things) whether an excuse for the delay exists and whether the opposing party would suffer unfair surprise, substantial inconvenience, or other prejudice. See Foman v. Davis, 371 U.S. 178, 182 (1962); Estate of Ravetti v. Commissioner, T.C. Memo. 1992-697. The Court looks with disfavor on untimely requests for amendment that, if granted, would prejudice the other party. See, e.g.,

**[\*13]** <u>Farr v. Commissioner</u>, 11 T.C. 552, 566-567 (1948), <u>aff'd sub nom.</u> <u>Sloane v. Commissioner</u>, 188 F.2d 254 (6th Cir. 1951); <u>Estate of Lee v. Commissioner</u>, T.C. Memo. 2009-303.

Although respondent has not explained his delay in asserting the penalty, he notified petitioners in his pretrial memorandum of his intent to assert it.  That memorandum was filed two weeks before this case was called for trial.  Petitioners were thus given sufficient notice to prepare for trial on this issue, and they had a full opportunity to address the penalty in post-trial briefing.  They do not contend that respondent's delay prejudiced them, and they presented no evidence of surprise or inconvenience.  Finding no prejudice, we will grant respondent's motion. <u>See</u> <u>Phillips v. Commissioner</u>, T.C. Memo. 2013-215 (granting post-trial motion to amend answer to assert accuracy-related penalty).

The Code imposes a 20% penalty upon the portion of any underpayment of tax that is attributable (among other things) to "[a]ny substantial understatement of income tax." Sec. 6662(a), (b)(2).  An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of an individual for any penalty.  <u>See</u> <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001).

[*14] The notice of deficiency determined an understatement of income tax in excess of $76,000, which we have sustained. This amount comfortably exceeds $5,000 and 10% of the total tax required to be shown on petitioners' 2010 return. Respondent has thus carried his burden of production by demonstrating a "substantial understatement of income tax." See sec. 7491(c).

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." Once the Commissioner has carried his burden of production, the taxpayer bears the burden of proving reasonable cause and good faith. Higbee, 116 T.C. at 446-447. The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

Petitioner-husband prepared petitioners' 2010 joint return. He did not testify to having received any advice from a tax professional regarding the proper tax

[*15] treatment of the $525,000 withdrawal. ING sent petitioners a Form 1099-R stating that $186,302 of this distribution was taxable, but they chose not to report any part of the distribution as taxable or attach this document to their return. Their cryptic explanation that "any potential gains should be applied to the prior capital loss carryforward" had no plausible legal basis. And because petitioner-wife was employed full time throughout 2010, petitioners had no factual basis for claiming exemption from the section 72(q) penalty on the theory that she was "disabled."

Petitioners did not have "substantial authority" or a "reasonable basis" for either of these positions. See sec. 6662(d)(2)(B)(i) and (ii). We likewise find that their arguments are too lacking in legal and factual basis to constitute a reasonable misunderstanding of law, particularly in light of petitioner-husband's education and occupation as a licensed attorney and former C.P.A. See sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have thus not shown that there was reasonable cause for their underpayment. We will accordingly sustain the accuracy-related penalty with respect to the full amount of the underpayment.

To reflect the foregoing,

An appropriate order and decision will be entered for respondent.